## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 50777

STEPHEN ARTHUR LOWERY,      )
           )
     Claimant-Respondent,      )
           )     **Boise, September 2024 Term**
v.           )
           )     **Filed: December 11, 2024**
GALEN KUYKENDALL LOGGING,   )
Employer, ASSOCIATED LOGGERS   )     **Melanie Gagnepain, Clerk**
EXCHANGE, Surety.      )
           )
     Defendants-Appellants.    )
_____)

Appeal from the Idaho Industrial Commission.

The Commission's decision is <u>affirmed</u>.

Breen Veltman Wilson, PLLC, Boise, attorneys for Defendants-Appellants. Susan R. Veltman submitted argument on the briefs.

Stephen Arthur Lowery, Orofino, Pro Se. Stephen A. Lowery submitted argument on the briefs.

_____

BEVAN, Chief Justice.

Appellants Galen Kuykendall Logging and its surety Associated Loggers Exchange (jointly "Kuykendall Logging") appeal from an Idaho Industrial Commission decision awarding workers' compensation benefits to Respondent Stephen Lowery. Kuykendall Logging argues that the Commission erroneously determined that Lowery met his burden of proving he had a "new" occupational disease at L3-4 that manifested while he was employed by Kuykendall Logging. Kuykendall Logging asserts that Lowery's L3-4 injury was a continuation of a prior degenerative disease process that began in 1992 when he suffered from an L5-S1 disk herniation. For the reasons expressed below, we affirm the Commission.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Lowery was born on July 16, 1961, and was 60 years old at the time proceedings took place before the Commission. For most of Lowery's work life, he has been employed in the logging

industry as a heavy equipment operator, specifically, as the operator of a type of heavy equipment known as a "shovel loader." In 1991 or 1992, Lowery suffered from an L5-S1 disk herniation and bulging disk at L4-5 which he related to his employment. On September 28, 1992, Lowery filed a workers' compensation claim in Alaska, and on October 15, 1992, Lowery underwent a discectomy at L5-S1. Exploration of the L4-5 space failed to demonstrate either nerve compression or evidence of a disk herniation, so no discectomy was performed at that level. In June 1993, Lowery was given a 10% whole person impairment rating by his treating surgeon.

On January 11, 2002, Lowery suffered another injury to his low back, which he described as "[p]ain started shortly after operating shovel and chasing under swing yarder" while employed by another company in Alaska. On January 14, 2002, Lowery filed a new Alaska workers' compensation claim. An MRI study performed on May 2, 2003, demonstrated degenerative disk disease at L5-S1 with associated left-sided foraminal stenosis. Mild disk bulging was identified at L4-5 along with disk dehydration at L3-4. The abnormalities seen at L3-4 and L4-5 were not thought to be pathological. Dr. Kenneth Leung, M.D., ultimately recommended a redo decompression and fusion at L5-S1, however, Dr. Leung stated that even if Lowery underwent surgery "the rest of his back is at risk if he continues to do this type of work." On September 15, 2003, Lowery underwent an L5-S1 decompression and interbody fusion.

On July 20, 2004, a CT myelogram demonstrated a failed fusion at L5-S1, minimal disk bulging at L3-4 and L4-5, and signs of probable arachnoiditis below the L4 level. On February 15, 2005, a repeat CT myelogram showed a possible slight left-sided bulge at L2-3. At L3-4 no sign of herniation was seen nor any sign of neuroforaminal compromise. Ligaments at this level appeared to be "slightly hypertrophied" posterolaterally. At L4-5, a mild broad-based disk bulge was seen but without neural compromise. At L5-S1 nonunion of the previous fusion was again suspected.

On March 14, 2005, Lowery underwent a procedure to redo the L5-S1 fusion. Afterward, Lowery was given an impairment rating of 27% of the whole person, 10% referable to the 1992 claim, and 17% referrable to the 2002 claim. Between January 2003 and September 2006, Lowery was found to be disabled for purposes of Social Security Disability. Lowery's disability ended on September 13, 2006, and he was found to be employable per Social Security criteria.

Lowery began working for Kuykendall Logging in 2010 as a shovel logger. It was customary for Kuykendall Logging to shut down logging operations for one to two months every

March or April due to the spring thaw. During the shutdown, Lowery worked for Evergreen Timber in Alaska. The evidence concerning the duration of Lowery's employment with Kuykendall Logging is inconsistent. Originally, the Commission found Lowery quit working for Kuykendall Logging on May 25, 2019, claiming that Kuykendall Logging failed to follow through with a promise to replace the machine that was "beating up" Lowery's back. But after a subsequent hearing, the Commission made a new finding that Lowery continued working for Kuykendall Logging until December 2019, and for about one week in May 2020. Lowery then went to work for Evergreen Timber full-time.

On November 1, 2015, Lowery had a CT of the lumbar spine, which showed multilevel degenerative changes, with disk space narrowing, and vacuum disk disease most significant at the thoraco-lumbar junction at T12-L1 and L1-2. November 1, 2015, x-rays showed no significant degenerative changes at L3-4 or L4-5. Significant changes at the thoraco-lumbar level were noted, consistent with the CT of the same date.

On October 17, 2016, Lowery underwent an MRI at St. Joseph Regional Medical Center in Lewiston. The radiologist report reflected significant changes at the levels above the previous L5-S1 fusion, notably at L3-4:

> L2-L3: Annular disc bulging and endplate osteophyte formation. Significant facet and ligamentum flavum hypertrophy. There is severe spinal canal stenosis. Crowding of the nerve roots within the thecal sac is noted. Moderate to severe bilateral neural foraminal stenosis.

> L3-L4: Disc bulging and small endplate osteophyte formation. Hypertrophy of the facets and ligamentum flavum. Mild to moderate spinal canal stenosis. Moderate left and moderate to severe right neural foraminal stenosis.

> L4-L5: Mild ventral spinal canal narrowing. Neural foramina are obscured by susceptibility artifact.

> L5-S1: No appreciable spinal canal stenosis. Neural foramina are not well seen.

> On November 30, 2017, Lowery underwent another CT that read:

> T12-L1: Annular bulging is effacing the thecal sac.

> L1-2: Severe desiccation of the disc with annular bulging and facet arthrosis is causing moderately severe spinal canal stenosis with moderate bilateral neural foraminal narrowing.

> L2-3: Annular bulging and facet arthrosis is causing severe spinal canal stenosis and mild bilateral neural foraminal narrowing.

> L3-4: Annular bulging and facet arthrosis is causing moderately severe spinal canal stenosis with moderate bilateral neural foraminal narrowing.

3

L4-5: There is annular bulging seen with facet arthrosis causing mild spinal canal stenosis and there is mild bilateral neural foraminal narrowing.

L5-S1: Decompressive laminectomy with posterior pedicle screws are obscuring the exam, however I do not see evidence of nerve root impingement or spinal canal stenosis.

On December 20, 2018, a CT myelogram read:

T12-L1: Shallow annular bulge

L1-2: Severe desiccation of disc with osteophytosis and facet arthrosis is noted causing mild canal stenosis. There is 11 degree dextroscoliosis at this level. There is moderate bilateral neural foraminal narrowing.

L2-3: Annular bulging, facet arthrosis and ligamentum hypertrophy is seen causing moderate spinal canal stenosis and moderate bilateral neural foraminal narrowing.

L3-4: Shallow annular bulging, facet arthrosis and ligamentum hypertrophy is seen causing very severe spinal canal stenosis and severe bilateral neural foraminal narrowing.

L4-5: Annular bulging and facet arthrosis is seen causing mild bilateral neural foraminal narrowing.

L5-S1: Decompressive laminectomy with pedicle screws without evidence of nerve root impingement and spinal canal stenosis.

Lowery was seen by several doctors for his progressive low back complaints, including Dr. Damon J. Popovics, D.C. Between August 1, 2014, and November 21, 2019, Dr. Popovics notes detailed waxing and waning symptoms and several exacerbating/aggravating episodes of low back complaints. Dr. Popovics' notes also memorialize Lowery's eight-week employment in Alaska in the spring of 2018, and specify that after Lowery returned home he was experiencing severe pain in his low back around the site of his L5-S1 fusion with pain radiating into the right lower extremity down into his right foot.

In 2019, Lowery saw Dr. Jeffrey Larson. At Dr. Larson's direction, Lowery underwent another MRI on August 6, 2019, which demonstrated severe stenosis with a listhesis at L3-4, stenosis at L2-3, and that L4-5 was "unremarkable." Dr. Larson's records reflected that Lowery did not present with a history of an industrial accident as the cause of his complaints, though Lowery did tell Dr. Larson that his prior surgeries were industrially related, which Dr. Larson felt was "conceivable" based on Lowery's job description. After reviewing the radiological studies referenced above, Dr. Larson recommended an L3-4 fusion to address the "new" listhesis at that level. Dr. Larson recommended leaving the L4-5 level alone as it was thought to be "normal." On December 6, 2019, Dr. Larson performed the L3-4 decompression and fusion surgery.

4

On November 25, 2019, Lowery filed a pro se complaint against Kuykendall Logging citing "more back + leg pain, L4 vertebrae out of place, needing a L3-L4 fusion" as a result of the shovel logging equipment he used. Where Lowery was asked to provide the date of injury or manifestation of occupational disease he stated, "Don't really know." He described his mechanism of injury as "by shovel logging, getting beat, bang [sic], jared [sic] and slamed [sic] around, and hanging from seat belt." Kuykendall Logging answered Lowery's complaint and argued that Lowery's condition was not a compensable occupational disease because he denied the occurrence of an acute accident and injury. Instead, medical records reflected that he had low back treatment beginning in 1992 and multiple lower back surgeries. Kuykendall Logging raised the defense that Lowery's L3-4 injury was a preexisting condition; thus, recovery was barred under *Nelson v. Ponsness-Warren Idgas Enterprises*, 126 Idaho 129, 879 P.2d 592 (1994). Kuykendall Logging additionally denied that Lowery had timely notified it within 60 days of the manifestation date of his alleged occupational disease. Accordingly, Kuykendall Logging denied that Lowery was entitled to benefits under Idaho's Workers' Compensation Law.

On April 6, 2020, Dr. David Bauer conducted an independent medical review. Dr. Bauer first opined that Lowery's prior surgery at L5-S1 was not a substantial factor in the onset of his current complaint. Dr. Bauer explained:

> In my medical opinion, the work injury is not still a substantial factor in the conditions that are currently symptomatic. As a result of the industrial injury, Mr. Lowery underwent an L5-S1 fusion. L4-5 was not affected by this injury. There is a concept of "adjacent segment degeneration" (ASD), in which after a fusion the immediate next level becomes symptomatic. The development of adjacent level degeneration following cervical, lumbar, and lumbosacral fusions is most likely related to several postoperative mechanical factors as well as the normal aging process of the spine. Patients with preoperative disc degeneration at an adjacent segment were more at risk for the development of ASD. However, this does not extend to the non-adjacent or upper lumbar levels, or levels that are remote to the prior surgery. Therefore, the prior surgery at L5-S1 is not a substantial factor in the degeneration that occurred at the thoracolumbar junction, resulting in the surgery at L2 to L4. The contribution of the work injury to any subsequent degeneration at L4-L5 would be vanishingly small, a remote or trivial factor, because it has not degenerated in the decade since the L5-S1 fusion; if L4-5 were to now experience degeneration, it would be du[e] to the fusion performed for the more recent symptoms.

Dr. Bauer then opined that "Mr. Lowery's thoracolumbar spine has degenerated due to genetics and time." Dr. Bauer continued that "[r]egardless of the incident and the subsequent surgery from the 2002 incident, Mr. Lowery's condition would be the same. Said another way, the

industrial injury is not a significant factor. But for the work injury, Mr. Lowery would be in the same position he is now."

The parties appeared at a hearing before the Referee on March 23, 2022. Lowery appeared pro se and Kuykendall Logging was represented by counsel. At the hearing, Dr. Popovics testified that during his treatment of Lowery, Lowery's lumbar spine, at levels above the previous L5-S1 fusion, had been relatively quiescent and stable, only to suffer a very quick degeneration over the course of a year:

> I do know when I first met you probably 2012–'13, somewhere in there, I do recall that you had previous fusions from previous work injury and having a consultation with you and your wife about it. And then we did have serial x-rays as your symptoms were getting progressively worse, and that's what eventually led to another surgical consultation and a surgery with Dr. Larson, I believe. In between there from what I could see in the images that I took and the other doctors had taken was that there was - there wasn't continued degeneration of the area [of the] previous fusion, but there was what appeared to be relatively good disk spacing between, I believe, L4 and 5, the area above the fusion. That over time appeared to stay relatively stable and then degenerated very quickly over the course of about a year. And I don't know the specific dates. We have x-rays on both sides of that, but there was evidence of further deterioration damage that was not previously addressed by the Alaska Work Comp. And the only - my conclusion from that is that the only potential cause of that is continued wear and tear and kind of abuse of that area above that previous fusion.
>
> . . .
>
> And I can't say exactly what caused it, but the only thing that would create that much wear and tear and abuse on a disk to that degree, after especially seeing the videos of what you do in your job, would be that. And we've had continued conversations about this over time. And there was a rapid failure of that disk in very short period of time, in less than a year, and I believe it was probably around that time we started seeing exhibited radicular symptoms, or numbness, tingling, and weakness and stuff in your legs that did not exist when I met you far after you left working in Alaska.

On cross-examination, Dr. Popovics testified that even as early as his initial visit with Lowery, he advised Lowery that his low back problems were associated with the type of work he performed at his job.

At the hearing, Lowery testified that he saw Dr. Larson on June 19, and they did an x-ray that showed the L3-4 had shifted 10 millimeters and was pinching on the nerve. Lowery testified that he told Galen Kuykendall on the 25th that he may need surgery but was waiting to confirm with an MRI. Lowery was instructed to file a workers' compensation claim. In response to a question about the date of injury, Lowery explained that he didn't have an accident, this was an

ongoing problem from his job. Lowery testified that he did not understand that his increasing pain complaints were related to a "new injury" at L3-4 until June 19, 2019, when he went to see Dr. Larson.

On October 11, 2022, the Referee submitted findings of fact, conclusions of law, and recommendation concluding that Lowery failed to show that a compensable accident occurred or that he suffered from a compensable occupational disease. The Referee was persuaded by Dr. Bauer's report that showed the scientific likelihood of a lack of relationship between Lowery's work and the progressive nature of his degenerative condition. The Referee found that Lowery failed to produce sufficient facts to show that his work as a shovel logger caused or aggravated his particular condition. Similarly, the Referee found that Lowery failed to allege facts necessary to support an occupational disease claim, and based on medical evidence from Dr. Bauer, it was unlikely Lowery could establish that one was present.

The Commission declined to adopt the Referee's recommendation, and on February 2, 2023, the Commission entered its own findings of fact, conclusions of law and order. The Commission agreed with the Referee that Lowery failed to demonstrate that his L3-4 injury resulted from an accident. Nevertheless, the Commission concluded that Lowery's L3-4 injury was a compensable occupational disease. Relying on Dr. Bauer's report, the Commission determined that Lowery's L3-4 condition arose independently from his previous issues at L5-S1. However, the Commission disagreed with Dr. Bauer's opinion that Lowery's L3-4 lesion resulted from the unfortunate intersection of age and genetics unconnected to his employment, finding Dr. Popovics' opinion that Lowery's current symptoms were related to his job to be more persuasive. The Commission concluded that Lowery's disease manifested on or after June 19, 2019, the date he learned of his diagnosis from Dr. Larson. Although the Commission found that Lowery suffered from preexisting degeneration at L3-4 before he began working for Kuykendall Logging, and that his work as a shovel logger for Kuykendall Logging aggravated his degenerative condition at L3-4, it concluded that Lowery's claim was not barred by the rule of *Nelson*. The Commission further found that Lowery complied with the notice and limitation requirements set forth in Idaho Code sections 72-701 to 72-706, and 72-448.[1] The Commission awarded Lowery past medical benefits

_____

[1] Idaho Code section 72-448(1) provides specific limitations on the time allowed to provide written notice of the manifestation of an occupational disease to an employer and the time for filing a claim for worker[s'] compensation benefits: "(1) Unless written notice of the manifestation of an occupational disease is given to the employer within

7

and time loss benefits but concluded he had not proven entitlement to permanent partial impairment (PPI) or permanent partial disability (PPD).

Kuykendall Logging filed a motion for reconsideration, asserting that "[t]he Commission's findings of fact regarding Claimant's last injurious exposure to his occupational disease and the manifestation date of his disease do not support its conclusions of law and order." Kuykendall Logging argued that the Commission erroneously deemed Kuykendall Logging to be the "last employer" despite several findings of fact that showed that Lowery was actually working for Evergreen Timber in Alaska at the time the Commission determined Lowery's occupational disease manifested.

The Industrial Commission issued an order on reconsideration in which it adhered to its previous decision that Lowery's L3-4 injury represented an occupational disease causally related to the demands of his employment, unconnected to his prior lumbar spine surgery at L5-S1. The Commission also continued to find that although Lowery may have had symptoms related to the L3-4 fusion for a period of years prior to June 19, 2019, that is the date his disease manifested. That said, the Commission determined that "there was a potential for conflict" in the following factual finding from its February 2, 2023, decision:

> Claimant commenced his employment with Employer sometime in 2010. His employment with Employer came to an end on May 25, 2019. He quit because Employer failed to follow through with a promise to replace the machine that was "beating up" Claimant's back. Since then, and through the date of hearing, Claimant has been employed by Evergreen Timber in Alaska.

The Commission concluded that although Lowery had satisfied his burden of establishing that the hazards to which he was exposed are characteristic of and peculiar to his employment with Kuykendall Logging, whether they could be held liable for payment of medical and indemnity benefits depended on identifying the employer in whose employ Lowery "was last injuriously exposed to the hazards of his disease as of the date of first manifestation and disablement. Pursuant to Idaho Code section 72-714(3), the Commission determined that the interests of justice were best served by reopening the hearing of this matter to allow additional testimony.

---

sixty (60) days after its first manifestation, . . . and unless claim for worker[s'] compensation benefits for an occupational disease is filed with the industrial commission within one (1) year after the first manifestation, all rights of the employee to worker[s'] compensation due to the occupational disease shall be forever barred." *See also* I.C. §72-706 (time limit on application for hearing).

The Commission held a hearing on September 26, 2023, to determine this discrete issue. On October 20, 2023, the Commission entered an order that concluded Lowery satisfied his burden of proving that as of his date of manifestation, he was last injuriously exposed to the hazards of his disease while in the employ of Kuykendall Logging at his customary job as a shovel logger. Kuykendall Logging filed a timely notice of appeal to this Court.

## II. ISSUES ON APPEAL

1. Are the Commission's conclusions of law that Lowery suffered from a new occupational disease at L3-4 supported by its findings of fact?

2. Did the Commission err in its conclusion that Lowery's occupational disease manifested on or after June 19, 2019?

3. Did the Commission err in concluding that the *Nelson* doctrine did not preclude Lowery's recovery?

4. Did the Commission err in finding that Lowery complied with the notice and limitations requirements in Idaho Code sections 72-448 and 72-706?

5. Did the Commission act beyond its authority by retaining jurisdiction and holding a second hearing after issuing its February 2, 2023, decision?

## III. STANDARD OF REVIEW

"In appeals from the Commission, this Court's review is limited to questions of law, 'which include whether the Commission's factual findings are supported by substantial and competent evidence and the application of the facts to the law.' " *Shumway v. Evans Chiropractic, PA*, 173 Idaho 226, 230, 541 P.3d 58, 62 (2023) (quoting *Hiatt v. Health Care Idaho Credit Union*, 166 Idaho 286, 290, 458 P.3d 155, 159 (2020)). "Because the Commission is the fact finder, its conclusions on the credibility and weight of the evidence will not be disturbed on appeal unless they are clearly erroneous. This Court does not weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented." *Hiatt*, 166 Idaho at 290, 458 P.3d at 159 (quoting *Ehrlich v. DelRay Maughan, M.D., P.L.L.C.*, 165 Idaho 80, 83, 438 P.3d 777, 780 (2019)). "However, we must set aside the Commission's order where it failed to properly apply the law to the evidence." *Allen v. Partners in Healthcare, Inc.*, 170 Idaho 470, 475, 512 P.3d 1093, 1098 (2022) (citing *Thrall v. St. Luke's Reg'l Med. Ctr.*, 157 Idaho 944, 947, 342 P.3d 656, 659 (2015)).

## IV. ANALYSIS

### A. The Commission's conclusion that Lowery suffered from a new occupational disease at L3-4 is supported by its findings of fact.

9

Kuykendall Logging's first argument on appeal is that the Commission's findings of fact do not support its conclusions of law that Lowery suffered from a "new" occupational disease. Specifically, Kuykendall Logging asserts the Commission erroneously constructed its own medical theory that Lowery's L3-4 degenerative disease was a new lesion that arose independently from his earlier injuries and symptoms at L5-S1, even though it may have resulted from the same type of occupational hazards that caused the L5-S1 injury.

"In addition to assisting claimants with injuries or disablement stemming from work-related accidents, Idaho's worker's compensation law provides benefits to claimants suffering from occupational diseases." *Sundquist v. Precision Steel & Gypsum, Inc.*, 141 Idaho 450, 453, 111 P.3d 135, 138 (2005) (*Mulder v. Liberty Nw. Ins. Co.*, 135 Idaho 52, 55, 14 P.3d 372, 375 (2000)). An occupational disease is one that arises from the nature of employment and is "peculiar to the trade, occupation, process, or employment[.]" I.C. § 72-102(21)(a).

> The phrase, "peculiar to the occupation," is not here used in the sense that the disease must be one which originates exclusively from the particular kind of employment in which the employee is engaged, but rather in the sense that the conditions of that employment must result in a hazard which distinguishes it in character from the general run of occupations.

*Mulder*, 135 Idaho at 55, 14 P.3d at 375 (citation omitted).

As with industrial accident claims, an occupational disease claimant has the burden of proving, to a reasonable degree of medical probability, a causal connection between the condition for which compensation is claimed and occupational exposure to the substance or conditions which caused the alleged condition. *Langley v. State, Indus. Special Indem. Fund*, 126 Idaho 781, 786, 890 P.2d 732, 737 (1995) (citing *Hagler v. Micron Tech., Inc.*, 118 Idaho 596, 598, 798 P.2d 55, 57 (1990)).

The Commission first analyzed whether Lowery's L3-4 injury was part of a single disease process that earlier manifested as the lesion at L5-S1, or a new condition that resulted from the work Lowery performed later while in the employ of Kuykendall Logging. Lowery acknowledged that he had degenerative and operative changes to his lumbar spine that predated his employment with Kuykendall Logging, but he argued that his L3-4 injury was a new disease process that arose independent of the L5-S1 condition. Conversely, Kuykendall Logging argued that Lowery's problems at L3-4 represent the expected progression of a single disease process that first manifested in the early 1990s.

10

In consideration of Lowery's claim that he suffered from a "new" occupational disease, the Commission relied on the opinions provided from Dr. Popovics and Dr. Bauer. Dr. Popovics had warned Lowery since 2014 that his spine degeneration was due to the demands of his work. Dr. Popovics testified that following the L5-S1 fusion redo in 2005, Lowery's lumbar spine stayed relatively stable, with preservation of the disk space at L4-5, the level immediately above the L5-S1 fusion. Yet in a relatively brief period before the December 2019 surgery, Lowery suffered rapid deterioration of the level above the L5-S1 disk space. While Dr. Popovics connected this deterioration to the demands of Lowery's work, he did not say that the L3-4 lesion developed independent of Lowery's earlier problems at L5-S1.

Meanwhile, Dr. Bauer's report clearly articulated his opinion that the L3-4 lesion arose independent of the earlier problem at L5-S1. Dr. Bauer addressed the potential that Lowery's L3-4 problems are linked to the L5-S1 lesion via "adjacent segment disease." Because the L5-S1 level is fused, more stress is placed on adjacent motion segments, and in this fashion, accelerated degeneration at segments adjacent to a fusion can be causally related to the fused segment. In this case, Dr. Bauer rejected the assertion that adjacent segment disease was responsible for Lowery's L3-4 lesion, since the motion segment immediately adjacent to the fusion, the L4-5 level, had not suffered degeneration.

Based on this evidence, the Commission rejected Kuykendall Logging's argument that without Lowery's L5-S1 lesion he would not be suffering from the lesion at L3-4, finding there was no evidence that absent the L5-S1 lesion Lowery would not have his current problem at L3-4. To the contrary, the Commission found that Dr. Bauer's report convincingly explained that the development of the L3-4 lesion had nothing to do with Lowery's problems two levels below. The Commission then concluded that the L3-4 lesion did not result from the aggravation of Lowery's problems at L5-S1, even though the L3-4 lesion may have resulted from exposure to the same type of occupational hazards that caused the L5-S1 injury.

On appeal, Kuykendall Logging argues that the Commission impermissibly shifted the burden of proof to Kuykendall Logging to establish that Lowery's L3-4 degenerative condition would not have developed but for his 1992 L5-S1 disc herniation. Further, Kuykendall Logging asserts that the Commission misconstrued Dr. Bauer's opinion and impermissibly constructed its own medical theory when it found that Lowery's L3-4 degenerative disease was a new lesion that arose independently from his earlier injuries and symptoms at L5-S1, even though it may have

11

resulted from the same type of occupational hazards that caused the L5-S1 injury. Specifically, Kuykendall Logging argues that after finding Dr. Bauer's report convincing in concluding that Lowery's lesion at L3-4 had nothing to do with Lowery's problems at L5-S1, the Commission ignored the rest of Dr. Bauer's opinion on causation, in which he expressly rejected the claim that Lowery's work as a shovel logger caused his injury at L3-4.

Dr. Bauer opined that Lowery's chronic lumbar and radicular pain is part of a degenerative disease that had progressed due to genetics over time, "which would be present regardless of his employment." Dr. Bauer continued, "[Lowery's] continued work in heavy equipment has not definitely worsened or aggravated his lumbar conditions . . . there would be no contraindication to returning to heavy equipment." On the other hand, Lowery's longtime chiropractor Dr. Popovics believed that Lowery's lower back degeneration was aggravated by his work as a shovel logger. Dr. Popovics also opined that Lowery suffered from continued wear and tear above the previous fusion at L5-S1. Dr. Popovics could not point to a specific timeframe for when Lowery's injury to L3-4 occurred, testifying:

> I can't be specific to a specific date. My opinion is that it's been a continual and gradual onset. I have seen lots of loggers over the years, and usually it is due to repetitive impact and movement in heavy equipment because there isn't very good suspension. But I can't point to a specific day and to which job or machine that may have contributed to that injury.

The Commission relied on both expert opinions to conclude that the L3-4 lesion did not result from the aggravation of Lowery's problems at L5-S1 (taken from Dr. Bauer's opinion), even though the L3-4 lesion may have resulted from exposure to the same type of occupational hazards that caused the L5-S1 injury (taken from Dr. Popovics' opinion). Kuykendall Logging argues that although the Commission may utilize expertise in drawing inferences from the facts or record to resolve conflicts in the evidence, it may not construct a new medical theory that is not articulated by any of the doctors who treated or evaluated Lowery.

In *Mazzone v. Texas Roadhouse, Inc.*, this Court held that the Referee improperly interpreted the DSM-IV-TR manual to arrive at her own unqualified medical opinion:

> Certainly, the statute permits the referee to look at the manual and use the manual to weigh the methodology of conflicting medical experts. However, a referee is not at liberty to interpret the manual to form his or her own unqualified medical opinions. For that, a qualified witness is necessary. Here, the referee exceeded her authority and interpreted the manual to form her own medical opinion.

154 Idaho 750, 759, 302 P.3d 718, 727 (2013). The Court further stated:

12

> Where there is both a positive and negative diagnosis between two qualified doctors, the fact finder may examine the methodologies of both physicians to determine which physician is more credible. However, to use one's own lay understanding of a medical document, which requires specialized expertise to understand and interpret, to conclude that a person with that specialized knowledge improperly made a medical diagnosis is improper.

*Id*. at 759–60, 302 P.3d at 727–28.

In denying Kuykendall Logging's motion for reconsideration, the Commission explained that it hears many contested cases and is exposed to a great deal of information relating to various medical issues, however, *Mazzone* makes it clear that the Commission may not rely on its specialized knowledge as a substitute for evidence. Put another way, the Commission may not rely on what it independently knows, or thinks it knows about a medical topic to determine whether to accept or reject the opinion of a medical expert. The Commission may, however, use its expertise in drawing inferences from the facts or record to resolve conflicts in evidence.

Here, the Commission acknowledged that Dr. Popovics and Dr. Bauer rendered conflicting opinions on the cause of Lowery's L3-4 lesion. The Commission then adopted Dr. Popovics' opinion that Lowery's L3-4 lesion was causally related to the demands of his employment, rejecting Dr. Bauer's opinion that Lowery's lumbar spine degeneration was ascribable to age and genetics without contribution from his employment. The Commission found that "careful review of Dr. Popovics' comments revealed that Lowery's 'condition' worsened due to the prior L5-S1 fusion <u>and</u> his ongoing degeneration, not that the L5-S1 fusion is responsible for causing or contributing to Lowery's L3-L4 lesion." However, the Commission noted that it was difficult to discern whether Dr. Popovics' ultimate opinion was that Lowery's L3-4 lesion was, in some respect, causally related to his prior L5-S1 fusion. To fill this gap, the Commission relied on Dr. Bauer's opinion that Lowery's L5-S1 fusion had no impact on the L3-4 motion segment.

This case is different than *Mazzone*. There, the referee improperly interpreted the DSM-IV manual of mental disorders to arrive at her own unqualified medical opinions. Here, the Commission did not depart from the proffered opinions to construct its own medical theory. Rather, it weighed the expert opinions presented by Dr. Bauer and Dr. Popovics and ultimately as an appropriate exercise by a fact finder, found it more credible that Lowery's symptoms arose during the course of his employment as a logger instead of as a natural progression of his age and genetics. Although Dr. Popovics could not specifically opine that Lowery suffered from a new lesion that arose independent from his earlier injuries and symptoms at L5-S1, his failure to do so

13

does not negate Dr. Bauer's direct testimony in that respect. Dr. Bauer opined that if Lowery's L5-S1 fusion had accelerated degeneration, the motion segment immediately adjacent to the fusion would have seen some effects. Because the motion segment at the L4-5 level had not suffered degeneration, Dr. Bauer opined that Lowery's L3-4 lesion was related to something other than the L5-S1 fusion. Dr. Popovics opined that "something else" was Lowery's occupation as a logger:

> I can't say exactly what caused it, but the only thing that would create that much wear and tear and abuse on a disk to that degree, after especially seeing the videos of what you do in your job, would be that. And we've had continued conversations about this over time. And there was a rapid failure of that disk in very short period of time, in less than a year, and I believe it was probably around that time we started seeing exhibited radicular symptoms, or numbness, tingling, and weakness and stuff in [Lowery's] legs that did not exist when I met [him] far after [he] left working in Alaska.

In *Tenny v. Loomis Armored US, LCC*, an employer made an argument similar to Kuykendall Logging's, suggesting the Commission "pieced" together its own medical opinion in violation of the requirement of medical proof as to causation. 168 Idaho 870, 879, 489 P.3d 457, 466 (2021). In *Tenny*, a claimant sustained a right-sided lumbar disc herniation injury in 2014 during his employment. *Id*. at 873, 489 P.3d at 460. Claimant immediately began treatment, receiving a series of epidural steroid injections (ESI) in his back at L3-4. *Id*. After the second ESI, claimant began to complain of increasing left hip and groin pain. *Id*. Claimant was seen by several medical professionals to pinpoint the cause of his left hip and groin pain. He eventually underwent an independent medical examination (IME) with Dr. Rodde Cox. *Id*. at 874–75, 489 P.3d at 461–62. Dr. Cox initially opined that there was a causal relationship between claimant's back and leg complaints and his reported injury on the job; however, after reviewing a subsequent MRI, Dr. Cox amended his report to reflect that claimant's pain was caused by a left-sided bursitis, which was not caused by the work injury. *Id*. at 875, 489 P.3d at 462. Following Dr. Cox's IME, the surety concluded claimant was at maximum medical improvement and denied the rest of his claim for medical treatment related to the left-sided hip pain. *Id*.

The matter was assigned to Referee Harper, who characterized the question for resolution as "whether [claimant's] ongoing left-sided hip/groin pain is causally related to his industrial accident, including whether it is a compensable consequence of medical treatment provided to him for his accepted work injury." *Id*. Ultimately, Referee Harper found that not one specific doctor's opinion carried the most weight, "rather, when the evidence is pieced together from the various

14

statements and admissions of the experts, the totality of the testimony and evidence supports the position that 'something happened' at" Tenny's second ESI. *Id*. Referee Harper noted that it was only after the January 2017 MRI that "at least two of the physicians who originally felt that [Tenny's] complaints were consistent with nerve damage" changed their opinions. "No expert gave a persuasive explanation for why, if [Tenny] had suffered from iliopsoas bursitis from the date of his second injection, it was not discovered for two years thereafter." *Id*. Recognizing that the "weight of the decision rest[ed] primarily on a temporal relationship" between Tenny's onset of pain and the second ESI, Referee Harper noted that "any persuasive medical evidence in addition to a temporal relationship may tip the scale in favor of causation, even when such opinion does not provide for the exact nature of the injury." *Id*. The Industrial Commission subsequently adopted Referee Harper's recommendation as their own. *Id*.

On appeal, this Court held that it was a close and difficult case; however, two physicians opined that Tenny's pain was causally related to the second ESI. *Id*. at 879, 489 P.3d at 466. We concluded that "[t]he decisions below reflect significant analysis of the medical records and reports generated by physicians, and the Commission's approach to the many opinions may also be read as an attempt to analyze and reconcile the relative credibility of the opinions." *Id*.

As we held in *Tenny*, the Commission may consider the totality of the testimony and evidence, which in this case included opinions of both Dr. Bauer and Dr. Popovics, to reach a conclusion about whether the claimant suffered from an occupational disease. Further, despite Kuykendall Logging's assertion, the Commission's consideration of whether these expert opinions established that Lowery suffered from a new occupational disease at L3-4 or a continuation of Lowery's degenerative disease at L5-S1 did not shift the burden of proof to the defendants. We agree with the Commission that Dr. Bauer's opinion about why the L3-4 lesion did not result from the aggravation of L5-S1 can exist independent of his other opinions concerning causation. Based on the other evidence presented, specifically Dr. Popovics' opinion on causation, the Commission concluded that Lowery's lower back degeneration was aggravated by his work as a shovel logger. This conclusion is supported by the evidence. Thus, we affirm.

Kuykendall Logging separately argues that the Commission erred in determining Lowery's L3-4 degenerative disease was a new occupational disease without evaluating whether the risk of developing degenerative disease at L3-4 is characteristic of and peculiar to his employment with Kuykendall Logging. To establish the "characteristic of, and peculiar to" element of an

15

occupational disease, a worker must show that the conditions of his employment resulted in a hazard that distinguishes it in character from the general run of occupations. *Mulder v. Liberty Nw. Ins. Co.*, 135 Idaho 52, 14 P.3d 372 (2000). In *Mulder*, the Commission found that the claimant's employment exposed him to long periods of repetitive upper extremity motions, including writing, keyboarding, and gripping a steering wheel and that these risks were not characteristic of all occupations. *Id*. at 53–54, 14 P.3d at 373–74. In upholding the Commission, the Court took notice of the fact that while a significant fraction of occupations might require an employee to drive, write, and use a computer keyboard, an equally great number do not. *Id*. at 55–56, 14 P.3d at 375–76.

Here, the Commission found that the hazards to which Lowery was exposed in his customary profession caused his L3-4 lesion. The Commission was further persuaded that the risk to which Lowery was exposed is characteristic of and peculiar to his occupation. More so than in *Mulder*, the Commission determined it was clear that the risks to which Lowery was exposed are not encountered in the general run of occupations. In the general run of occupations workers do not face the repetitive jarring, shaking, and bumping that Lowery described. After reviewing Lowery's testimony, and a four-minute video depicting Lowery's work activity, the Commission was satisfied that Lowery's job subjected him to a risk of injury that could be distinguished from the risks inherent in the general run of occupations.

We hold that the Commission's factual findings are supported by substantial and competent evidence and are sufficient to support the Commission's legal conclusion that Lowery's occupational disease was characteristic of and peculiar to his employment. The risks to which Lowery was exposed are characteristic of and peculiar to his employment as a shovel logger. Thus, we affirm.

We note that Kuykendall Logging additionally argues the Commission erred in failing to distinguish the work Lowery performed while working for Kuykendall Logging versus Evergreen Timber, but we conclude that is more appropriately addressed in the next section of our analysis regarding what employer Lowery was working for at the time his occupational disease manifested.

**B.    The Commission did not err in determining that the date of manifestation occurred while Lowery was employed by Kuykendall Logging.**

Kuykendall Logging also argues that the Commission erred in concluding that Lowery's occupational disease manifested on or after June 19, 2019. An occupational disease exists under the workers' compensation law when it first manifests. *Sundquist v. Precision Steel & Gypsum*,

141 Idaho 450, 454, 111 P.3d 135, 139 (2005). "[M]anifestation" occurs when the claimant knows he has an occupational disease or is so informed by a physician. *Id*. at 455, 111 P.3d at 140; *see also* I.C. § 72-102(18). "The question of when a claimant's medical condition becomes 'manifest' and 'preexisting' relative to later events is a question of fact." *Id*. at 453, 111 P.3d at 138. This factual finding is dependent on the claimant's subjective knowledge. *Id*. at 454, 111 P.3d at 139.

Thus, Kuykendall Logging argues, citing Idaho Code section 72-102(18), that the manifestation date is *either* the date on which a claimant "knows" he has an occupational disease *or* the date on which a physician informs the claimant that he has an occupational disease, whichever occurs first.

The Industrial Commission has identified three conditions that must all be true for a worker to "know" that he has an occupational disease: (1) the person believes it to be true; (2) the person must have justifying reasons for believing it to be true, and (3) it must in fact be true. *Dahlke v. Ash Grove Cement Co.*, IC 2012-016998 (April 25, 2014). Alternatively, for the purposes of notice and filing requirements of Idaho Code section 72-448, a disease is not manifest "until its cause has been clearly identified by competent medical authority as related to the employee's work and that information has been communicated to the employee." *Boyd v. Potlach Corp*, 117 Idaho 960, 793 P.2d 192 (1990). In *Boyd*, the claimant began working at a lumber production facility in the fall of 1984. *Id*. at 960, 793 P.2d at 192. Soon after, the claimant's preexisting asthma became worse, and in February 1985, his doctor advised him to avoid cedar dust and seek employment that did not involve exposure to cedar dust because she suspected it was causing his increased respiratory problems. *Id*. At that time, however, the doctor did not rule out other allergens as causing claimant's lung ailment. *Id*. at 961, 793 P.2d at 193. The Court concluded that the claimant did not know the work-related nature of his disease until he reacted positively to a cedar dust challenge test in June 1985; thus, it was on that date that claimant's occupational disease had manifested. *Id*.

The date of manifestation of the occupational disease is crucial because it triggers the employer's obligation to provide medical services, appliances, and supplies, and that triggers the running of the time periods for giving notice to the employer and filing a claim for benefits. I.C. §§ 72-432 and 72-448. A disease may result from more than one employment, but where it does, only the employer at the time of the last injurious exposure to the hazards of the disease can be held liable for the payment of benefits. I.C. § 72-439(3).

17

In this case, Lowery filed a complaint with the Commission on November 25, 2019. The complaint described the nature of his condition as: "More back + leg pain. L4 vertebrae out of place, needing a L3-L4 fusion." Under the section "Date of injury or manifestation of occupational disease," Lowery stated: "Don't really know." The Commission concluded that although Lowery knew about the work-related nature of his problem at L5-S1, and he knew his back pain was getting worse over time, Lowery did not know that his current symptoms related to a lesion at L3-4 until he was advised of that fact by Dr. Larson on June 19, 2019. Substantial evidence supports the Commission's finding that Lowery did not know he suffered from an occupational disease at L3-4 until he was informed by Dr. Larson's office.

That said, there is insufficient evidence to support the Commission's determination that Dr. Larson is the one who informed Lowery of this defect on June 19, 2019. The Commission's original findings of fact acknowledge this, noting that although June 19, 2019, was the date of Lowery's first visit with Dr. Larson, there was no opinion in the treatment note for that date as to the cause of Lowery's complaints. A closer look at the evidence reveals that Lowery was actually seen by a nurse practitioner in Dr. Larson's office on that date, who reported that Lowery's "complaints include low back pain, right lower extremity symptoms in the L3-4 distribution." At that time, Lowery had not yet undergone updated imaging of his lumbar spine, nor was he diagnosed with any specific findings on the L3-4 level.

Then, in a subsequent fact-finding hearing ordered by the Commission, testimony established that Lowery worked for Kuykendall Logging up until his December 6, 2019, L3-4 decompression and fusion surgery. Thus, even if the date of manifestation was between June 19, 2019—the first explicit mention that there was a new issue at L3-4—and December 6, 2019—the date of Lowery's surgery—the Commission concluded that the evidence would still support a finding that the manifestation of Lowery's L3-4 occupational disease arose while Lowery was employed by Kuykendall Logging. This finding is also supported by substantial evidence.

Kuykendall Logging argues that in reaching this conclusion, the Commission erroneously raised and applied the last injurious exposure doctrine codified in Idaho Code section 72-439(3). Section 72-439(3) provides:

> Where compensation is payable for an occupational disease, the employer, or the surety on the risk for the employer, in whose employment the employee was last injuriously exposed to the hazard of such disease, shall be liable therefor.

I.C. § 72-439(3).

18

First, Kuykendall Logging's claim that the Commission erroneously raised section 72-439(3) is without merit. This statute is the law that governs these types of claims, not a legal theory that the Commission can waive if not properly raised. Second, we hold that the Commission did not err in relying on the earliest date Lowery was informed that he was suffering from degeneration at L3-4, even if the evidence showed that diagnosis was not confirmed by Dr. Larson until a later date. Because Lowery was still employed by Kuykendall Logging during that entire time, the Commission did not err in holding Kuykendall Logging liable, even though Lowery performed similar work for Evergreen Timber after his December 2019, surgery.

C.      **Lowery's claim is not barred by the *Nelson* doctrine.**

Although the Commission concluded that Lowery's L3-4 injury was distinct from his L5-S1 lesion, the Commission recognized that Lowery "had evidence of minor work-related degenerative changes at L3-4 prior to the commencement of his employment" with Kuykendall Logging in 2010. Kuykendall Logging alleges that if Lowery's L3-4 lesion is a preexisting condition that was aggravated by his occupational disease, then recovery is precluded under the *Nelson* doctrine as stated in *Nelson v. Ponsness-Warren Idgas Enterprises*, 126 Idaho 129, 879 P.2d 592 (1994). Kuykendall Logging argues that although Lowery was treated for more acute findings at L5-S1 when he initially sought treatment in the early 1990s, Lowery's symptoms continued to progress over the years, and doctors diagnosed him with degeneration disease of the lumbar spine well before he began working for Kuykendall Logging in 2010.

In *Nelson*, the claimant was diagnosed with carpal tunnel syndrome and possible thoracic outlet syndrome in 1980. *Id*. at 130, 879 P.2d at 592. Nelson refused to undergo surgery at the time and continued to experience intermittent symptoms in her hands up until she began working at Ponsness-Warren Idgas Enterprises ("Ponsness-Warren") in 1988. *Id*. Nelson's job at Ponsness-Warren required repetitive tightening and twisting and turning of screws throughout the day, which worsened Nelson's upper extremity symptoms. *Id*. She eventually underwent surgery in 1989, and her doctor believed that her work had aggravated her condition. *Id*. Nelson filed a claim against Ponsness-Warren, and following a hearing, the Commission determined that the aggravation of her preexisting condition was compensable even though it was not caused by an industrial accident. *Id*. On reconsideration, the Commission held that Nelson's preexisting condition was asymptomatic before she began working for Ponsness-Warren, and therefore, her carpal tunnel

19

syndrome was a "new" occupational disease that arose out of and in the course of her employment with the company. *Id*. at 131, 879 P.2d at 594.

Ponsness-Warren appealed, and this Court held that Nelson's carpal tunnel syndrome was not "asymptomatic" because it had manifested itself prior to her employment with Ponsness-Warren. *Id*. Regardless, the Court held that a preexisting condition need not be asymptomatic to qualify as a preexisting condition. *Id*. Therefore, the Court reversed the portions of the Commission's decision that concluded the claimant's preexisting carpal tunnel condition was a "new" occupational disease for which Ponsness-Warren was liable. *Id*. at 131–32, 879 P.2d at 594–95. Because the claimant's preexisting carpal tunnel syndrome was not aggravated by an industrial accident, the Court held that her condition was not compensable. *Id*. at 133, 879 P.2d at 596.

Thus, the *Nelson* doctrine provides that a claimant seeking compensation for the aggravation of a preexisting condition must prove his injuries are attributable to an accident that can reasonably be "located" as to the time and place it occurred. *Id*. at 133, 879 P.2d at 596. The preexisting condition need not be symptomatic for the rule of *Nelson* to apply. *Id*. at 131, 879 P.2d at 594. The *Nelson* doctrine extends to all preexisting conditions, "whether they are occupational diseases or simply weakness or susceptibilities." *DeMain v. Bruce McLaughlin Logging*, 132 Idaho 782, 784, 979 P.2d 655, 657 (1999) (holding the claimant's asymptomatic preexisting lumbar degenerative disease was not aggravated by an industrial accident, and therefore, his claim was barred by *Nelson*).

This case is different. Unlike *Nelson*, where the claimant's ongoing symptoms could be attributed only to her carpal tunnel syndrome that she was aware of before her employment at Ponsness-Warren, Lowery believed that his lower back pain was related to his prior fusion. It was not until Dr. Larson (or someone at his office) informed Lowery that he had suffered from new degeneration at L3-4 that Lowery became aware he had suffered from a new occupational disease at L3-4. The Commission concluded that even though an employee may have signs and symptoms of an occupational disease in a particular employment, the condition is not actionable until the claimant knows, or is told by a qualified medical authority, that his condition is related to his employment. We agree with this statement of the law.

This Court's decision in *Sundquist v. Precision Steel & Gypsum*, 141 Idaho 450, 111 P.3d 135 (2005), is instructive. In *Sundquist*, the claimant worked as a drywall taper for most of his adult life and worked for various employers before he was employed by Precision Steel & Gypsum

("Precision"). *Id*. at 452, 111 P.3d at 137. While working for a previous employer two years before the claimant began working for Precision, the claimant noticed tenderness in his elbow and pain in his wrist. *Id*. These symptoms started out mild and infrequent, but over time became more frequent and severe. *Id*. The claimant began to wear a wrist brace and take ibuprofen for the pain. *Id*. While working for Precision, claimant's wrist pain became so severe that it awakened him at night. *Id*.

After two weeks to a month of severe symptoms, the claimant consulted a doctor who advised the claimant that his symptoms were work related. The claimant was diagnosed as suffering from tardy ulnar nerve palsy (sometimes designated as "cubital tunnel syndrome"), and underwent surgery that ameliorated but did not eliminate his symptoms. *Id*. at 452–53, 111 P.3d at 137–38. The claimant filed a workers' compensation claim against Precision, as well as several former employers. *Id*. at 453, 111 P.3d at 138. The Referee concluded that the claimant suffered from a compensable occupational disease for which Precision was wholly liable because the claimant's condition did not manifest until claimant was at Precision. *Id*. The Referee specifically determined that the claimant's occupational disease was not a "preexisting" condition. *Id*. The Industrial Commission adopted the findings of fact and conclusions of law recommended by the Referee. *Id*.

On appeal, Precision argued that the *Nelson* doctrine should apply to deny the claimant's occupational disease claim, since it was shown that he had physical signs and symptoms of the disease prior to his occupational exposure at Precision. *Id*. at 453–54, 111 P.3d at 138–39. In other words, the claimant had a "preexisting condition" from his earlier employments that was aggravated/accelerated by the demands of his employment with Precision. The Court rejected the application of *Nelson*, holding that because the claimant's date of manifestation did not occur until his employment with Precision began, the preexisting signs and symptoms of cubital tunnel syndrome did not qualify as a preexisting condition. *Id*. at 454, 111 P.3d at 139.

Thus, for an occupational disease to be a preexisting condition under the holding in *Nelson*, the claimant must know there has been a prior manifestation of the disease. *Sundquist*, 141 Idaho at 454, 111 P.3d at 139. For example, the claimant in *Nelson* sought benefits for the aggravation in 1988 and 1989 of her carpel tunnel syndrome that had been first diagnosed by a physician in 1980. 126 Idaho at 130–31, 879 P.2d at 592–94. Here, there is no question that Lowery had a history of lower back problems prior to his employment with Kuykendall Logging. Indeed, Lowery

21

had been advised by physicians as early as 2003 that "the rest of his back is at risk if he continues to do this type of work." Still, Lowery did not receive a specific diagnosis that L3-4 had been compromised until he was advised by Dr. Larson in 2019. Under Idaho Code section 72-102(18), manifestation does not occur until claimant knows, or is advised by a qualified physician, that he has an occupational disease. Because Lowery's occupational disease related to L3-4 did not arise until he was employed by Kuykendall Logging, the Commission did not err in concluding that the *Nelson* doctrine did not bar Lowery's recovery.

**D.** **The Commission did not err in finding that Lowery complied with the notice and limitation requirements of Idaho Code sections 72-448 and 72-706.**

Kuykendall Logging additionally asserts that the Commission erred in finding that Lowery complied with the notice and limitation requirements of Idaho Code sections 72-448 and 72-706. Kuykendall Logging argues that the overwhelming weight of the evidence shows that Lowery knew his lower back degenerative disease and chronic lower back and lower extremity symptoms were aggravated by his work as a shovel logger long before he began working for Kuykendall Logging, and he had been informed of such by multiple medical providers over the years.

Idaho Code section 72-448 governs the notice and limitations of occupational disease claims and provides that written notice of the manifestation of an occupational disease must be given to the employer within sixty days after its first manifestation, and a claim for workers' compensation benefits must be filed with the Commission within one year after the first manifestation. I.C. § 72-448(1). Meanwhile, Idaho Code section 72-706 provides limitations for when a worker may file an application for a hearing. I.C. § 72-706. When no compensation has been paid on a claim, the claimant, unless misled to his prejudice by the employer or surety, has one year from the date of making a claim to make and file an application with the Commission requesting an award under such claim. I.C. § 72-706(l).

Lowery testified that he told Kuykendall Logging that the nature of his pain was due to the L3-4 lesion on June 25, 2019, and that Kuykendall Logging instructed him to file a claim. This resulted in a First Report of Injury or Illness ("FROI") being generated, which revealed that Kuykendall Logging was notified on June 25, 2019; the nature of injury/illness was "strain," and was described as "Strains Over Time Due To Work/Strains Back & R Leg." The Commission concluded that the FROI, filed on August 13, 2019, constituted written notice to Kuykendall Logging of Lowery's L3-4 occupational disease and that it was made within sixty days of the manifestation of June 19, 2019. The Commission also concluded that Lowery's workers'

22

compensation complaint, filed November 25, 2019, satisfied Idaho Code section 72-448(1)'s requirement that Lowery's claim be filed within one (l) year of the June 19, 2019, manifestation. We agree with the Commission's application of these periods of limitation to the facts here. We affirm the Commission's conclusion that Lowery complied with the notice and limitation requirements of Idaho Code sections 72-448 and 72-706.

> **E.** **The Commission did not err in retaining jurisdiction based on Kuykendall Logging's motion for reconsideration and the Commission did not abuse its discretion by holding a hearing to determine whether Lowery's occupational disease manifested while he was employed by Kuykendall Logging.**

Last, Kuykendall Logging argues that the Commission erred in retaining jurisdiction after it issued its February 2, 2023, decision, and exceeded its authority when it decided to rehear, on its own initiative, a factual issue that had already been adjudicated. The Commission's February 2, 2023, findings of fact, conclusions of law and order held:

1. Claimant has failed to meet his burden of proving the occurrence of an accident causing an injury.

2. Claimant has satisfied his burden of proving that his L3-L4 lesion represents an occupational disease separate and distinct from his L5-S1 injury, that his L3-L4 lesion is causally related to the demands of his employment, and that he was last injuriously exposed to the hazards of his disease while in the employ of Employer.

3. The date of first manifestation of Claimant's occupational disease is on or after June 19, 2019.

4. Claimant's claim is not barred by the rule of *Nelson v. Ponsness-Warren Idgas Enterprises*. . . .

5. Claimant has complied with the notice and limitations requirements set forth in Idaho Code §§ 72-701–706 and § 72-448.

6. Claimant is entitled to recover medical benefits in the amount of $53,135.18.

7. Claimant is entitled to time loss benefits during his period of recovery from December 6, 2019 through February 25, 2020, at the statutory rate.

8. Claimant has not proven entitlement to PPI or PPD.

9. All other issues are moot.

10. Pursuant to Idaho Code § 72-718, this decision is final and conclusive as to all matters adjudicated.

On February 21, 2023, Kuykendall Logging filed a motion for reconsideration. The motion argued, in part, that the Commission erred because it made inconsistent findings about where Lowery was employed when he was last injuriously exposed to the hazards of his disease as of the

date of first manifestation of Lowery's L3-4 occupational disease. The Commission agreed and acknowledged that the following factual finding from its earlier decision was problematic:

Claimant commenced his employment with Employer sometime in 2010. His employment with Employer came to an end on May 25, 2019. He quit because Employer failed to follow through with a promise to replace the machine that was "beating up" Claimant's back. Since then, and through the date of hearing, Claimant has been employed by Evergreen Timber in Alaska.

The Commission determined that its use of the word "since" gave rise to an interpretation that Lowery's employment by Evergreen Timber started right after he left Kuykendall Logging rather than sometime later, but that was inconsistent with his testimony at the hearing:

Q. [BY MS. VELTMAN] When is the last time that you worked for anybody?
A. [BY CLAIMANT] A couple days ago.
Q. Okay. For whom are you currently working?
A. Evergreen Timber.
Q. Okay. How long have you worked for them?
A. Two years steady, and then I think it was maybe a year or two, maybe prior to that, for just a couple months in the wintertime.
Q. When is the last time you worked for Galen Kuykendall?
A. That was in May. Must be around May 25, 2019. I'd have to look at my W-2s, but I think that was it.
. . . .
Q. Who did you work for after May 2019?
A. Evergreen Timber.
Q. All right. Where is Evergreen Timber located?
A. Alaska.
Q. What do you do for Evergreen Timber?
A. I log.
Q. Can you be more specific?
A. I shovel log. I do the same thing I have done for 40 years.
Q. Do you continue to go back and forth between Idaho and Alaska to work for them?
A. Nope.
Q. Do you work for the company in Idaho currently?
A. No.
Q. All right. When – I got the impression you worked for Evergreen Timber just a couple of days ago?
A. Yes.
Q. All right. Where was that?
A. Alaska.

The Commission concluded that this testimony demonstrated that Lowery did not start working for Evergreen Timber immediately, rather, he started steadily working for Evergreen Timber around March 22, 2020, which was shortly after he was released to return to work by Dr.

24

Larson on February 25, 2020. Meanwhile, Lowery's recorded statement from September 3, 2019, showed that Lowery was still employed by Kuykendall Logging at that time. The Commission found this conflicted with Lowery's testimony that he quit his job at Kuykendall Logging on May 25, 2019.

The Commission determined that Lowery had satisfied his burden of establishing that the hazards to which he was exposed are characteristic of and peculiar to his employment. That said, whether Kuykendall Logging could be held liable for payment of medical and indemnity benefits depended on identifying the employer in whose employ Lowery was last injuriously exposed to the hazards of his disease as of the date of first manifestation and disablement. Pursuant to Idaho Code section 72-714(3), the Commission determined that the interests of justice would be best served by reopening the hearing of this matter to allow additional testimony. Ultimately, the Commission ordered that the parties could either stipulate to Lowery's employment history, or the Commission would hold another hearing to adduce evidence on that issue. After holding a hearing to determine this discrete issue, the Commission entered an order in which it concluded that Lowery satisfied his burden of proving that as of his date of manifestation, he was last injuriously exposed to the hazards of his disease while in the employ of Kuykendall Logging at his customary job as a shovel logger.

On appeal, Kuykendall Logging argues the Commission exceeded its authority when it decided to rehear a factual issue on which it had issued a final determination, and when it removed the case from the appointed referee without reassigning the case to itself. In general, the Commission's decision to retain jurisdiction to allow parties to submit additional evidence is reviewed for an abuse of discretion. *Green v. Green*, 160 Idaho 275, 280, 371 P.3d 329, 334 (2016), abrogated on other grounds by *Aguilar v. Indus. Special Indem. Fund*, 164 Idaho 893, 436 P.3d 1242 (2019). When reviewing the determinations of the Commission for an abuse of discretion, this Court considers four factors: whether the Commission "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Sheehan v. Sun Valley Co*., 171 Idaho 248, 251, 519 P.3d 1188, 1191 (2022) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)).

Idaho Code section 72-714(3) grants the Commission authority to "make such inquiries and investigations as may be deemed necessary." Idaho Code section 72-718 also provides:

A decision of the commission, in the absence of fraud, shall be final and conclusive as to all matters adjudicated by the commission upon filing the decision in the office of the commission; provided, within twenty (20) days from the date of filing the decision any party may move for reconsideration or rehearing of the decision, *or the commission may rehear or reconsider its decision on its own initiative*, and in any such events the decision shall be final upon denial of a motion for rehearing or reconsideration or the filing of the decision on rehearing or reconsideration.

(Emphasis added).

This Court has concluded that Idaho Code section 72-718 provides a twenty-day period from the date a decision is filed, for the Commission on its own initiative, or upon the motion of a party, to undertake reconsideration or rehearing of that decision. *Dennis v. Sch. Dist. No. 91*, 135 Idaho 94, 97, 15 P.3d 329, 332 (2000). It is well established that the Commission's change of position from its first decision to its decision upon reconsideration of the facts and applicable law does not exceed the authority of the Commission. *Id.* (citing *Kindred v. Amalgamated Sugar Co.*, 114 Idaho 284, 756 P.2d 401 (1988)).

Kuykendall Logging, within the twenty days required, filed a motion for reconsideration, which specifically asked the Commission to reconsider its determination as to the identity of the employer in whose employ Lowery was last injuriously exposed to the hazards of his disease as of the date of first manifestation of Lowery's L3-4 occupational disease. By timely moving for reconsideration, Kuykendall Logging extended the Commission's jurisdiction to reevaluate its prior decision.

Having concluded the Commission retained jurisdiction while Kuykendall Logging's motion for reconsideration was pending, we must still consider whether the Commission abused its discretion in holding another hearing to conduct additional fact-finding on the discrete issue of whether Lowery was employed by Kuykendall Logging when his L3-4 lesion manifested. We hold that Kuykendall Logging has failed to show an abuse of discretion occurred. The Commission acknowledged its discretion to reopen the hearing to elicit additional testimony based on Idaho Code section 72-714(3). Whether Lowery's occupational disease manifested at L3-4 while in the employ of Kuykendall Logging would either absolve Kuykendall Logging of responsibility for the claim or implicate their liability for the payment of workers' compensation benefits. The Commission's decision to hold another hearing on this critical issue was reasonable, particularly given the Commission's determination that it would require minimal time and effort to adjudicate. Also, the Commission's decision to retain the case previously assigned to the referee is a matter

of judicial economy for the Commission, who has the final say in any event, and for the parties. We thus conclude that Kuykendall Logging failed to show the Commission abused its discretion in allowing the parties to submit additional evidence on the date Lowery's employment with Kuykendall Logging came to an end.

## V. CONCLUSION

The Commission's decision is affirmed.

Justices BRODY, MOELLER, ZAHN, and MEYER CONCUR.