111 P.3d 135

**Larry Lee SUNDQUIST, Claimant–Respondent,**

v.

**PRECISION STEEL & GYPSUM, INC., Employer, and Liberty Northwest Insurance Corporation, Surety, Defendants–Appellants,**

**and**

**Superior Interiors, Inc., Employer, and Idaho State Insurance Fund, Surety; F & S Interiors, Inc., Employer, and Idaho State Insurance Fund, Surety; Lombac Construction Services, Inc., Employer, and Everest National Insurance Company, Surety; Interior Systems, Inc., Employer, and Everest National Insurance Company Surety; and Interior Systems, Inc., Employer, and Advantage Workers Compensation Insurance Company, Surety, Defendants.**

No. 30364.

Supreme Court of Idaho, Boise, January 2005 Term.

April 6, 2005.

Law Offices of Harmon & Whittier, Boise, for appellant. Monte R. Whittier argued.

Bradford S. Eidam, Boise, argued for respondent.

BURDICK, Justice.

Precision Steel & Gypsum and its surety Liberty Northwest Insurance (jointly, Precision) appeal from the decision of the Idaho Industrial Commission finding them liable for the worker's compensation claim of Larry Lee Sundquist, a former Precision employee. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Sundquist worked as a drywall taper for most of his adult life. He began as an apprentice in 1968, and after taking a hiatus beginning in 1993 he resumed his career in 2000. A drywall taper smoothes "mud" over sheetrock seams, rendering them invisible. The work involves using trowels called "knives" to spread the mud evenly. The pressure that must be applied to the work surface and the repetitive motions required of a drywall taper invite certain limiting physical conditions over time, such as to the drywall taper's wrist and elbow.

Sundquist worked for many different employers before he first came to be employed by Precision in the February of 2002. In late 2000 while working for one of those previous employers Sundquist noticed tenderness in his elbow and pain in his wrist. The symptoms were mild and infrequent and so did not cause Sundquist great concern. Over time, the symptoms became more frequent and severe. He began to wear a wrist brace and to take ibuprofen for the pain.

When Sundquist came to work for Precision, he worked harder and for longer hours than he had previously. Sundquist's symptoms became worse, and sharp pains forced him to drop his knives when he worked. The wrist pain became so severe it awakened him at night. Sundquist did not recall any specific incident in which he may have injured his wrist or elbow, either while working for Precision or some previous employer.

On April 26, 2002, after two weeks to a month of such severe symptoms, Sundquist first consulted with a doctor about the pain. The doctor first told Sundquist his symptoms were work related on the "second or third visit." The second visit occurred on May 16, 2002, the third on June 13, 2002. During that third visit Sundquist's doctor restricted him from work. Sundquist's last day working for Precision was June 11, 2002. He provided Precision with timely notification of his medical condition.

Sundquist was diagnosed as suffering from tardy ulnar nerve palsy (sometimes designated as "cubital tunnel syndrome") and under-

went surgery that ameliorated but did not eliminate his symptoms.

Sundquist claimed worker's compensation against Precision and several other former employers. Those cases were consolidated and heard by an Industrial Commission referee on August 1, 2003. Three of the defendants had been dismissed prior to the hearing. The referee determined that Sundquist "suffers from a compensable occupational disease for which Precision is wholly liable[.]" Sundquist's condition was found to have manifested itself and to have become disabling during his time at Precision. The referee specifically determined that relative to his employment at Precision, Sundquist's occupational disease was not a "preexisting" condition. The findings of fact and conclusions of law recommended by the referee were subsequently adopted by the Industrial Commission.

Precision filed a timely appeal from the decision of the Industrial Commission, which is presently before this Court.

## II. STANDARD OF REVIEW

When reviewing a decision of the Industrial Commission, this Court exercises free review over questions of law. *Uhl v. Ballard Medical Products, Inc.*, 138 Idaho 653, 657, 67 P.3d 1265, 1269 (2003). The question of when a claimant's medical condition becomes "manifest" and "preexisting" relative to later events is a question of fact. *Dumaw v. J.L. Norton Logging*, 118 Idaho 150, 155, 795 P.2d 312, 317 (1990). The factual findings of the Industrial Commission will be upheld provided they are supported by substantial and competent evidence. *Uhl*, 138 Idaho at 657, 67 P.3d at 1269. "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Id.* The conclusions reached by the Industrial Commission regarding the credibility and weight of evidence will not be disturbed unless the conclusions are clearly erroneous. *Hughen v. Highland Estates*, 137 Idaho 349, 351, 48 P.3d 1238, 1240 (2002). We will not re-weigh the evidence or consider whether we would have drawn a different conclusion from the evidence presented. *Id.*

## III. ANALYSIS

In addition to assisting claimants with injuries or disablement stemming from work-related accidents, Idaho's worker's compensation law provides benefits to claimants suffering from occupational diseases. *Mulder v. Liberty Northwest Ins. Co.*, 135 Idaho 52, 55, 14 P.3d 372, 375 (2000). An occupational disease is one that arises from the nature of employment and is "peculiar to the trade, occupation, process, or employment[.]" I.C. § 72–102(21)(a). Here, it was found by the Industrial Commission and agreed by both parties that Sundquist suffers from an occupational disease arising from his former career as a drywall taper.

### A. The *Nelson* Doctrine

Precision contends it is protected from liability under the doctrine articulated by this Court in *Nelson v. Ponsness–Warren Idgas Enterprises*, 126 Idaho 129, 133, 879 P.2d 592, 596 (1994). The *Nelson* doctrine provides that a claimant seeking compensation for the aggravation of a *preexisting condition* must prove his injuries are attributable to an accident that can reasonably be located as to the time and place it occurred. *Id.* Sundquist has not pointed to an identifiable accident or mishap contributing to his medical condition. However, the findings of fact reached by the Industrial Commission included a determination that Sundquist's occupational disease was *not preexisting* to his employment with that firm. The *Nelson* doctrine does not apply to *all* cases where there is an occupational disease, only in those where the claimant's occupational disease *preexisted* employment with the employer from whom benefits are sought. *Id.* Consequently, the *Nelson* doctrine would only be applicable in this case if Precision were able to persuade this Court to overturn the Industrial Commission's factual finding as to when Sundquist's condition first became manifest.

Precision argues that because Sundquist suffered from pain prior to coming to work for Precision, the Industrial Commission was wrong to find that Sundquist's occupational disease was not a preexisting condition. In

making its determination, the Industrial Commission considered evidence including Sundquist's testimony, his medical records, and the deposition testimony of physicians who had examined him. Precision has not argued that the Industrial Commission lacked substantial and competent evidence to support its factual finding.

## B. Manifestation

An occupational disease exists for the purposes of the worker's compensation law when it first manifests. With respect to occupational diseases, the worker's compensation law treats the "manifestation" of the disease as being equivalent to the time or occurrence of an accident causing an injury. I.C. §§ 72–216, 72–217, 72–218, 72–229, 72–307, 72–401, 72–411, 72–413, 72–413A, 72–419, 72–430, 72–706, 72–719, and 72–805. In addition, it is the manifestation of the occupational disease that triggers the employer's obligation to provide medical services, appliances, and supplies and that triggers the running of the time periods for giving notice to the employer and filing a claim for benefits. I.C. §§ 72–432 and 72–448.

In 1997, the Idaho legislature amended the law to include a definition of "manifestation," which is defined as "the time when an employee knows that he has an occupational disease, or whenever a qualified physician shall inform the injured worker that he has an occupational disease." Ch. 274, § 1, 1997 Idaho Sess. Laws 799, 802. This definition is subjective. The employee must know that he has an occupational disease or have been so informed by a qualified physician. In addition, the knowledge required is that he has an occupational disease, not that he has symptoms that are later diagnosed as being an occupational disease. Knowledge of symptoms is not synonymous with knowledge the symptoms are caused by an occupational disease. *Boyd v. Potlatch Corp.*, 117 Idaho 960, 793 P.2d 192 (1990).

For an occupational disease to be a preexisting condition under the holding in *Nelson v. Ponsness–Warren Idgas Enterprises*, 126 Idaho 129, 879 P.2d 592 (1994), there must have been a prior manifestation of the disease. Nelson sought benefits for the aggravation in 1988 and 1989 of her carpel tunnel syndrome that had been first diagnosed by a physician in 1980. *Id.* at 130–31, 879 P.2d at 592–94.

In the instant case, prior to Sundquist's employment with Precision, he had not sought any medical care with respect to the pain he was experiencing in his elbow and wrist. Whether or not he knew that such pain was caused by an occupational disease was a question of fact for the Industrial Commission. Its finding that he did not know is supported by substantial and competent evidence.

### 1. Alleged Medical Diagnosis Requirement

Precision asserts the Industrial Commission's determination of when Sundquist's condition manifested itself was in error. Precision argues the Industrial Commission wrongly held that prior medical diagnosis of a condition or occupational disease is required before a condition is "manifest." Precision correctly observes that the definition of "manifestation" found in I.C. § 72–102(18) contains no such requirement. Although a condition becomes manifest once "a qualified physician shall inform the injured worker that he has an occupational disease," manifestation also occurs "when an *employee knows* that he has an occupational disease[.]" I.C. § 72–102(18) (emphasis added).

The Industrial Commission, however, did not reach the holding attributed to it by Precision. Instead, the Industrial Commission reached a factual determination that Sundquist did not know his pain resulted from the onset of an occupational disease until he was so informed by his physician. The Commission noted that before Sundquist was diagnosed there were other possible explanations for his pain, such as arthritis. Sundquist's credibility in asserting he did not know his condition was work-related until his doctor told him so was weighed by the Industrial Commission referee, who flatly stated that "Claimant [Sundquist] is a credible witness." The Industrial Commission found Sundquist's knowledge he suffered from an occupational disease in this case coincided

with his medical diagnosis. The Industrial Commission did not read I.C. § 72–102(18) to *require* a medical diagnosis as alleged by Precision.

### 2. *DeMain*

Precision argues that *DeMain v. Bruce McLaughlin Logging,* 132 Idaho 782, 979 P.2d 655 (1999), stands for the proposition that for an occupational disease to be preexisting under *Nelson* the occupational disease does not have to be manifest as set forth in I.C. § 72–102(18). Precision's reading of *DeMain* is incorrect.

In *DeMain* the claimant sought compensation for lower back pain and numbness in his right leg. 132 Idaho at 783, 979 P.2d at 656. In 1976, many years before coming to work for the defendant-employer (McLaughlin), DeMain injured his back in a work-related accident. *Id.* at 782, 979 P.2d at 655. Although DeMain's injuries from that earlier accident were "asymptomatic" by the time he began working for McLaughlin, the Industrial Commission found those earlier injuries to have already been "preexisting" relative to DeMain's position with that employer. *Id.* at 783–85, 979 P.2d at 656–58. The Industrial Commission did not characterize the lingering effects of DeMain's 1976 injuries as a preexisting "occupational disease," but rather as a preexisting "weakness or susceptibility." *Id.* at 783, 979 P.2d at 656. The Commission found that DeMain's preexisting injury was "aggravated or 'lit up' " by the repetitive trauma he incurred operating heavy equipment for McLaughlin. *Id.*

In *DeMain,* this Court stated "the holding in *Nelson* is not limited to those cases where the pre-existing condition amounts to an occupational disease." Accordingly, DeMain's "weakness or susceptibility" arising from the 1976 work *accident* was found to bring *Nelson* into play, and without a second accident with his new employer the aggravation of DeMain's preexisting condition was not compensable. *Id.* at 784–85, 979 P.2d at 657–58. In short, *DeMain* expanded *Nelson* to apply not only to preexisting occupational diseases, but also to the effects of preexisting injuries. *Id.* at 782–83, 979 P.2d at 655–56.

The *Nelson* doctrine was applied in *DeMain* because there the claimant had been found to have aggravated a preexisting injury caused by an accident. *Id.* at 784, 979 P.2d at 657. In the present case, it was found by the Industrial Commission that Sundquist suffers from an occupational disease that was not preexisting to his employment with Precision. Unlike in *DeMain,* here the record contains no suggestion Sundquist's pain resulted from having aggravated a preexisting injury caused by an accident. Consequently, the holding in *DeMain* does not apply to the present facts.

### 3. "Incurred" As A Determination Separate From "Manifestation"

Idaho Code § 72–439(1) provides that "[a]n employer shall not be liable for any compensation for an occupational disease unless such disease is actually incurred in the employer's employment." Precision focuses on the use of the word "incurred" in the statute. From this Precision argues the factfinder must determine when an occupational disease is "incurred," and that this determination is separate and independent from the question of when "manifestation" takes place under I.C. § 72–102(18). "Manifestation" is argued by Precision to only be relevant to the notice and limitations requirements found in I.C. §§ 72–448 and 72–706. In contrast, Precision asserts the time when an occupational disease is "incurred" establishes which employer is liable to the claimant. Unlike "manifestation" which occurs when the claimant knows he has an occupational disease or is so informed by a physician, Precision contends an occupational disease is "incurred" at the point in time the claimant suffers the first symptoms. Applying its interpretation of the statutes to the present case, Precision argues that because Sundquist suffered from pain before he came to work for Precision, his occupational disease was "incurred" while he was working for a previous employer. That other employer, Precision contends, should be liable instead of Precision.

Precision's interpretation of the meaning of "incurred" as used in I.C. § 72–439(1) is unpersuasive. Precision takes "incurred" to be an identifiable point in time when the occupational disease came into existence. In

**456**

contrast, Sundquist argues the word "incurred" as used in this section means simply that the occupational disease arose out of and in the course of employment. Sundquist is correct. Idaho Code § 72–102(21)(b) defines the word at issue, stating that " '[c]ontracted' and 'incurred,' when referring to an occupational disease, shall be deemed the equivalent of the term 'arising out of and in the course of' employment."

Because in Idaho's worker's compensation law the word "incurred" means " 'arising out of and in the course of' employment," it is as much a reference to cause as to a particular point in time. *See* I.C. § 72–102(21)(b). As an occupational disease develops over time, it is possible for the disease to be "incurred" by a claimant under a series of different employers before it becomes manifest. In such a situation, I.C. § 72–439(3) provides that it is the last such employer, or its surety, who is liable to the claimant.[1] Here, the Industrial Commission found Precision to be that last employer within the meaning of I.C. § 72–439(3) and therefore correctly placed liability with Precision.

### IV. CONCLUSION

On the basis of substantial and competent evidence the Industrial Commission determined that Sundquist's occupational disease did not manifest itself within the meaning of I.C. § 72–102(18) until May 16, 2002. Because Sundquist's occupational disease was not manifest prior to his employment with Precision, it was not a preexisting condition relative to that firm. As a result, the Industrial Commission correctly declined to apply the *Nelson* doctrine under the present facts. This Court affirms the order of the Industrial Commission holding Precision and its surety solely liable to Sundquist. Costs to the Respondent.

Chief Justice SCHROEDER and Justices EISMANN, JONES and Justice WALTERS, Pro Tem concur.

---

1. Idaho Code § 72–439(3), states: "Where compensation is payable for an occupational disease, the employer, or the surety on the risk for the employer, in whose employment the employee was last injuriously exposed to the hazard of such disease, shall be liable therefor."