**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 52031**

| | | |
|---|---|---|
| THE ESTATE OF WILLIAM WEEKS, | ) | |
| | ) | |
| Claimant-Appellant, | ) | |
| | ) | Boise, September 2025 Term |
| v. | ) | |
| | ) | Opinion Filed: November 14, 2025 |
| ONEIDA COUNTY, Employer; IDAHO | ) | |
| STATE INSURANCE FUND, Surety, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendants-Respondents. | ) | |
| | ) | |

Appeal from the Idaho Industrial Commission.

The decision of the Idaho Industrial Commission is <u>affirmed</u>.

Mossman Law Office, LLP, Boise, for Appellant. Taylor L. Mossman-Fletcher argued.

Elam & Burke, PA, Boise, for Respondent. Daniel D. Fredrickson argued.

———————————

BRODY, Justice.

This appeal involves a worker's compensation claim. JaLyn Weeks appeals from a decision of the Idaho Industrial Commission ("the Commission") denying her medical and death benefits for the death of her husband, William Weeks, an employee of Oneida County's Road and Bridge Department. Following her husband's death from complications of COVID-19, Mrs. Weeks filed a worker's compensation complaint with the Commission, contending Mr. Weeks contracted the disease while working. She further argued COVID-19 is an acute occupational disease within the meaning of Idaho's worker's compensation laws, Idaho Code sections 72-102(21)(a) and 72-438 (2021). The Commission denied the complaint after concluding that it was "impossible" to prove by a preponderance of the evidence that Mr. Weeks actually contracted COVID-19 at work. On appeal, Mrs. Weeks contends the Commission erred by (1) applying the wrong legal standard and requiring proof "beyond every possible doubt" that the decedent contracted COVID-19 at work; (2) failing to resolve doubts in favor of compensability; and (3) ignoring its own factual findings

to reach an inconsistent conclusion. For the reasons expressed below, we affirm the Commission's decision.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

William Weeks was a resident of Malad City in Oneida County, Idaho, where he lived with his wife, JaLyn Weeks, on their family farm and cattle ranch. Mr. Weeks was employed as an equipment operator, alongside seven other crew members and their supervisor, with Oneida County's Road and Bridge Department. There, each employee worked four, ten-hour shifts every week—Monday through Thursday from 6:00 a.m. to 4:00 p.m.—and generally began each day with a five-to-fifteen-minute meeting. These meetings were held in the office break room, approximately eighteen-by-thirty feet in size, where crew members sat around a table and received their work assignments for the day. Once a meeting ended, the crew members would either immediately depart to complete their assignments in the field or perform certain tasks in the shop.

In September 2021, Oneida County had high transmission levels of COVID-19. In response to the COVID-19 pandemic, the County issued a statement recommending its employees take transmission precautions, including social distancing and teleconferencing instead of in-person meetings. However, the County also required employees in critical infrastructure positions, including the Road and Bridge Department, to maintain their "normal work schedule." To control the spread of COVID-19 within the Road and Bridge Department, masks were made available to employees should they choose to use them, as well as gloves and hand sanitizer. The employees generally chose not to wear masks. The morning meetings in the office break room continued as usual in September 2021.

On September 17, 2021—a Friday when employees in the Road and Bridge Department were off duty—one of Mr. Weeks' co-worker began feeling ill. The Co-worker called in sick on Monday, September 21, and did not return to work until Tuesday, September 28. Due to the shortage of tests available in the County at the time, the Co-worker did not get tested for COVID-19; however, he assumed he had the virus and did not return to work until all his symptoms were gone. No morning meeting was held the day the Co-worker returned to work due to a two-day equipment training that began Monday, September 27. Because the Co-worker missed the first day of training, he worked one-on-one with the trainer on the second day and did not interact with Mr. Weeks.

2

The day after the Co-worker returned to work, Wednesday, September 29, 2021, Mr. Weeks began to experience symptoms of COVID-19. He had spent the workday traveling to Preston, Idaho with two other employees in a single vehicle. That evening, he reported to Mrs. Weeks that "he had the chills" and "felt like he was getting sick." Nevertheless, he went to work the next day, again traveling to Preston with the same two employees in a single vehicle. On Friday, October 1—a regularly-scheduled day off work—Mr. Weeks went to the doctor and tested positive for COVID-19. Mrs. Weeks became ill a few days later and tested positive for COVID-19 on October 4, 2021. A second co-worker, one of whom traveled with Mr. Weeks to Preston on September 29 and 30, tested positive for COVID-19 on October 7, 2021.

Mr. Weeks never returned to work after testing positive for COVID-19. He was admitted to the hospital on October 7, 2021, then transferred to St. Luke's Regional Medical Center in Boise on October 9, 2021. There, he later passed away from complications due to COVID-19 at age 48.

Following her husband's death, Mrs. Weeks filed a worker's compensation claim for medical and death benefits, which the employer denied. She then filed a complaint with the Commission, alleging her husband had contracted COVID-19 from the daily morning meetings at work. The case proceeded to a hearing before a referee, where the parties raised two issues: (1) whether Mr. Weeks actually incurred COVID-19 from his employment; and (2) whether COVID-19 is a compensable, occupational disease under Idaho Code section 72-438.

At the hearing, Mrs. Weeks testified that her husband was a "homebody" who "didn't really like people or to go anywhere" other than the ranch and work. She explained that in September 2021, Mr. Weeks was bringing the cows home and preparing to sell the calves. He was also working hard to get a spring flowing on the ranch, and he would typically stay on the ranch until he returned home at approximately 7:30 or 8:00 p.m. each night. Mrs. Weeks testified that Mr. Weeks' uncle and a neighboring friend also worked on the ranch, helping with the cows and the water situation. Mrs. Weeks was uncertain whether Mr. Weeks visited the farm parts store that September for supplies to help with the spring; however, several undated receipts from the farm parts store were submitted as exhibits to be considered by the Commission, as was a receipt from the lumber store, dated September 18, 2021.

The referee also received testimony from Mr. Weeks' supervisor, who testified about Mr. Weeks' work environment, schedule, and tasks in September 2021. The supervisor testified that Mr. Weeks did not work with the Co-worker on any project in September, and they would not have

had workplace contact with each other apart from the morning meetings. She testified that during those meetings, Mr. Weeks and the Co-worker sat on opposite sides of the table, not directly across, with approximately five feet between them. The supervisor also testified that the employees had a habit of visiting the local convenience store for food after the morning meeting, before beginning their projects for the day. She testified that Mr. Weeks would frequently go to a large convenience store on the Utah border to buy a burrito and chewing tobacco. The Co-worker also testified, echoing the supervisor's testimony regarding the conditions of the Road and Bridge Department and the work habits of its employees. Specifically, the Co-worker testified that Mr. Weeks went to the convenience store, while the work trucks were warming up in the mornings, "[a]lmost daily."

Following the hearing, the parties submitted statements from, and conducted post-hearing depositions of, their respective experts on COVID-19. Dr. Coffman, the chosen expert for the employer and the State Insurance Fund, opined that Mr. Weeks could not have contracted COVID-19 from the Co-worker either before the Co-worker's absence from work (on or before September 16, 2021), or when the Co-worker returned on September 28, 2021, due to COVID-19's incubation period. Dr. Coffman explained that people typically become symptomatic three-to-five days after exposure to the virus causing COVID-19, and "certainly within a week." Because Mr. Weeks began experiencing symptoms on September 29, 2021, Dr. Coffman opined that he was most likely exposed to the virus between September 23 and 26. According to Dr. Coffman, even if the Co-worker was in fact ill with COVID-19 on September 15 or 16 and not some other virus—an assumption Dr. Coffman accepted as true for the purposes of his analysis—Mr. Weeks did not contract COVID-19 from him at that time because Mr. Weeks' illness manifested too late for an exposure on either of those dates to be the source of the symptoms. Thus, Dr. Coffman opined Mr. Weeks must have been exposed at a later date.

Similarly, Dr. Coffman opined the decedent did not contract COVID-19 from Co-worker on September 28, 2021, when Co-worker returned to work following his sick leave. Based on the onset of Mr. Weeks' symptoms on September 29, Dr. Coffman explained that the incubation period was "too short" for a September 28 exposure date: "COVID doesn't make you sick the next day. You need to have it replicating, multiplying, dividing, attacking more organs before symptoms develop between three-and-a-half to five days, not overnight."

To support this opinion, Dr. Coffman explained the progression of a COVID-19 infection as a bell-curve. Dr. Coffman explained that a person contracts the virus on day zero, virus detection begins day two, and symptoms may begin on day three:

> After exposure to the virus it begins to invade the epithelial cells of the new host. This takes approximately 48 hours for viral replication to be detected. Viral detection occurs 24 hours, on average, before symptoms develop.

> The typical timeline would be exposure on day 0, viral detection starting day 2, and symptoms, if they develop, on day 3, no sooner. Some patients have somewhat slower onset, however the onset of viral detection and symptom onset will be complete in close to 100% of patients by 7 days post-exposure. This timeline holds for patients with or without symptoms.

> As patients mature in the illness, the immune system begins to clear the virus. Studies looking at trying to recover viable infectious virus show that by day 8 after virus is first detected there will no longer be infectious virus present. This is not the same as having a negative PCR test since that assay will detect fragments of the RNA that are not part of an intact, infectious virus.

Dr. Coffman further explained that a person typically sheds the virus causing COVID-19 for eight to ten days, and the virus is typically cleared within two weeks. If a person is still shedding the virus and experiencing serious symptoms after two weeks, that person is typically immunocompromised or otherwise unable to fight the virus, becoming more ill over time and potentially dying from COVID-19 complications, as did Mr. Weeks.

Dr. Coffman further testified that, in September 2021, COVID-19 was "everywhere" and a general hazard to the public at large. He agreed that wearing a mask and social distancing are precautions to help prevent the transmission of COVID-19 but explained that the degree to which these precautions can prevent an infection is dependent on many other factors, including whether masks are worn by all individuals in all places a person might frequent, such as grocery stores, convenience stores, etc. Dr. Coffman emphasized that the most important factor in the transmission of COVID-19 is whether a person is around another person who is actively shedding the virus at the time (whether symptomatic or not).

Ultimately, Dr. Coffman concluded he could neither rule in nor rule out the possibility that Mr. Weeks contracted COVID-19 from an asymptomatic person at work (other than the Co-worker) on Thursday, September 23, because it was also possible that Mr. Weeks contracted the illness from someone else that day (such as a convenience store clerk, his neighbor, or his uncle) or from some other person he was around between September 24 and 26 (when the Road and Bridge Department was closed).

Mrs. Weeks' expert, Dr. Nathan, agreed with Dr. Coffman that COVID-19 "created a hazard common to the public in general of getting sick from the virus[.]" Despite this agreement, he opined that the employment practices of the Road and Bridge Department in September 2021 increased the risk of transmitting COVID-19 in the workplace and, more likely than not, led to Mr. Weeks' illness. Dr. Nathan emphasized that there was "no question" that the daily morning meetings, which were five-to-fifteen minutes long, were sufficient for the transmission of COVID-19 in the workplace:

> So we're in a pandemic. And I don't understand why they had meetings in a room, in a closed space, for no special reason. And the meetings themselves could be lengthy enough. And could provide -- basically anyone in the room could be exposed to this virus every time they meet. Also the meetings, they didn't -- I don't think the [C]ounty stressed vaccination. They didn't stress mask wearing. You know, just common things. They didn't stress keeping a window open during the meeting that was available. It was just very puzzling that they would do that.

> . . . .

> . . . There is no question [that five to fifteen minutes would be enough time for exposure or to transmit COVID-19].

Dr. Nathan also expressed concern regarding the employer's policies surrounding COVID-19 testing and paid sick leave if an employee contracted the virus:

> People might not be allowed to take time off if they are sick. There may be -- they may fear for their job if they take time off if they are sick. So the issue comes where people will just keep working. And they might get, you know, the vulnerable population ill. When it comes to the County over here it looks like their policies weren't so good. I don't think they had any mandatory vaccine policy. They didn't have a mask policy. Or a useful mask policy. They met in an enclosed space every day. And if an employee or worker took time off I don't believe they were paid. So that is the problem.

> . . . .

> . . . [I]t deters testing. One might not want to be tested because they don't want to show that they are sick. So if you test positive then I guess you have to take a week off and not get paid. So it would disincentivize people from getting tested. And that is an issue that comes up over and over again when it comes to matters like this.

Dr. Nathan then concluded that Mr. Weeks contracted COVID-19 during the course and within the scope of his employment at the Road and Bridge Department from the Co-worker. Dr. Nathan based his opinion on the assumption that Mr. Weeks did not have exposure to people outside of work, other than his wife, and the Co-worker was the only known source of contagion.

6

Dr. Nathan further concluded Mr. Weeks did not contract COVID-19 from his wife because she became ill with the virus after he did.

To support his conclusions, Dr. Nathan proposed a more flexible progression of the COVID-19 virus than did Dr. Coffman. He stated that Dr. Coffman's seven-day timeframe of exposure to symptom onset was "too rigorous," proposing instead that each person and each case is different. He opined that it was possible for a person to become symptomatic fourteen days after exposure, and it was also possible for a person to develop symptoms a day-and-a-half after exposure. Dr. Nathan further opined that there is no clear point in time for when a person is no longer shedding the virus, and the Co-worker still could have been shedding the virus when he returned to work on September 28. Thus, Dr. Nathan concluded the Co-worker could have transmitted the virus to Mr. Weeks any time between September 13 and 16, before the Co-worker was symptomatic with his illness, or between September 28 and 29, when the Co-worker was back at work.

In reaching this conclusion, Dr. Nathan did not discuss the progression of COVID-19 or the bell curve identified by Dr. Coffman with respect to symptom onset from the date of exposure. Instead, Dr. Nathan focused on exposure to the virus. Based on his assumptions that Mr. Weeks went nowhere other than work and his farm and had no contact with people outside of work other than his wife, Dr. Nathan concluded that Mr. Weeks' only possible exposure was at work. Thus, Dr. Nathan concluded Mr. Weeks contracted COVID-19 during the course of his employment.

After reviewing the experts' reports and depositions, the Commission denied Mrs. Weeks' claim for benefits, concluding she had failed to prove by a preponderance of the evidence that Mr. Weeks had contracted COVID-19 at work. The Commission found Dr. Coffman's opinion regarding COVID-19 transmission, exposure, and incubation to be more persuasive and rejected Dr. Nathan's proposition that the Co-worker could have transmitted the virus to Mr. Weeks when he returned to work on September 28. The Commission explained that this proposition was inconsistent with the science regarding viral replication:

> Dr. Nathan's opinion seems to be that once exposed, a host is immediately contagious despite also acknowledging that it does take time for the virus to replicate. In line with that, Dr. Nathan did think it was much more likely that the Decedent was exposed on the 16th than the 28th. Dr. Nathan's opinion that the Decedent could have been exposed on the 28th and then shown symptoms on the 29th is rejected.

7

The Commission also rejected Mrs. Weeks' proposition that Mr. Weeks contracted COVID-19 at work from another employee (other than the Co-worker) who became ill with symptoms after Mr. Weeks tested positive for COVID-19. The Commission explained that this proposition was speculative and would also implicate Mrs. Weeks as a possible source of contagion:

> Claimant's argument that . . . other co-workers of the Decedent[] could have been sources due to the "overlapping" nature of COVID also implicates the Claimant, Mrs. Weeks, as a potential source of exposure as she worked unmasked with children and spent significantly more time with the Decedent than his coworkers. However, Dr. Nathan's conclusion that the Decedent brought COVID-19 to Mrs. Weeks based on her getting sick after him makes more sense based on both expert's [sic] testimony and this logically applies equally to [the other co-workers] who were sick after the Decedent.

The Commission concluded that, due to the many unknowns regarding Mr. Weeks' whereabouts during the relevant time-period, Mrs. Weeks relied too heavily on circumstantial evidence and inferences, rather than direct proof, to establish that Mr. Weeks had actually "incurred" COVID-19 from his employment:

> 38. Direct proof of causation could be established if the Decedent saw literally no one except work colleagues who had symptomatic COVID-19 during the relevant timeframe. (*See Pierre v. ABF Freight*, 211 A.D. 1294, 180 N.YS.3d 337 (2022)). There are many more unknowns in this case due to the fact that the Decedent cannot explain his whereabouts during the relevant time period. . . .

> 39. In the relevant time frame from September 16 to September 29, the Decedent went to work, to his home, to the lumber store, and potentially went to a convenience store, a parts store, and possibly worked with his uncle or another individual while tending to his cows to provide them water. There is no credible evidence that anyone was symptomatic with COVID-19 around the Decedent in the relevant time frame. As noted above, asymptomatic exposure is the likely source, although not the only potential source, of the Decedent's COVID-19.

Ultimately, the Commission concluded it could not rule out the possibility that Mr. Weeks contracted COVID-19 from a cashier at the lumber or a convenience store, or from his uncle or neighbor on the ranch, and it was "impossible to prove on a more likely than not basis that the Decedent contracted COVID-19 at work." Because the Commission denied the claim on this ground, it declined to address whether COVID-19 is a compensable, occupational disease under Idaho Code section 72-438. Mrs. Weeks timely appealed.

8

## II.  STANDARD OF REVIEW

This Court's review of an Industrial Commission decision "is limited to questions of law, 'which include whether the Commission's factual findings are supported by substantial and competent evidence and the application of the facts to the law.' " *Lowery v. Galen Kuykendall Logging*, 174 Idaho 922, 930, 560 P.3d 1069, 1077 (2024) (quoting *Shumway v. Evans Chiropractic, PA*, 173 Idaho 300, 304, 541 P.3d 58, 62 (2023)). Whether an employee contracted an occupational disease from his or her employment is a question of fact to be determined by the Commission. *See Spivey v. Novartis Seed Inc.*, 137 Idaho 29, 32, 43 P.3d 788, 791 (2002) ("Whether an injury arose out of the course of employment is a question of fact to be determined by the Commission."); *Sundquist v. Precision Steel & Gypsum, Inc.*, 141 Idaho 450, 456, 111 P.3d 135, 141 (2005) ("Idaho Code [section] 72-102(21)(b) defines the word at issue, stating that '[c]ontracted' and 'incurred,' when referring to an occupational disease, shall be deemed the equivalent of the term 'arising out and in the course of employment.' " (Second alteration in original)). "Because the Commission is the fact finder, its conclusions on the credibility and weight of the evidence will not be disturbed on appeal unless they are clearly erroneous. This Court does not weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented." *Lowery*, 174 Idaho at 930, 560 P.3d at 1077 (quoting *Hiatt v. Health Care Idaho Credit Union*, 166 Idaho 286, 290, 458 P.3d 155, 159 (2020)). However, this Court "must set aside the Commission's order where it failed to properly apply the law to the evidence." *Id.* (quoting *Allen v. Partners in Healthcare, Inc.*, 170 Idaho 470, 475, 512 P.3d 1093, 1098 (2022)).

## III.  ANALYSIS

### A.  The Commission did not err in concluding that Mrs. Weeks failed to prove the decedent incurred COVID-19 from his employment.

"In addition to assisting claimants with injuries or disablement stemming from work-related accidents, Idaho's worker's compensation law provides benefits to claimants suffering from occupational diseases." *Sundquist v. Precision Steel & Gypsum, Inc.*, 141 Idaho 450, 453, 111 P.3d 135, 138 (2005) (citing *Mulder v. Liberty Nw. Ins. Co.*, 135 Idaho 52, 55, 14 P.3d 372, 375 (2000)). An occupational disease is one that arises from "the nature of an employment" and is "characteristic of, and peculiar to the trade, occupation, process or employment . . . ." I.C. § 72-102(21)(a) (2021); *see also Sundquist*, 141 Idaho at 453, 111 P.3d at 138. However, "[a]n employer is not liable for an occupational disease 'unless such disease is actually incurred in the employer's

9

employment.' " *Jobe v. Dirne Clinic/Heritage Health*, 163 Idaho 65, 67, 408 P.3d 63, 65 (2017) (quoting I.C. § 72-439(1)).

Here, the Commission declined to consider whether COVID-19 constituted an occupational disease covered under the worker's compensation law because it instead concluded Mrs. Weeks had failed to prove her husband contracted COVID-19 from his employment. Mrs. Weeks contends the Commission erred in reaching this conclusion and raises two main arguments in support of this contention. She first argues the Commission erred by failing to: (1) apply the correct legal burden to its determinations; (2) resolve any doubts regarding where Mr. Weeks contracted COVID-19 in favor of compensability; and (3) consider that even if Mr. Weeks contracted COVID-19 from a gas station, his gas station visits were within the course of the employment. Mrs. Weeks further argues that when the proper legal standards are applied to the facts as found by the Commission, its analysis and conclusion are not supported by substantial and competent evidence. We address each argument in turn.

> 1.    *The Commission applied the correct legal burden, proof by a preponderance of the evidence, to its determination of whether the decedent actually incurred COVID-19 from his employment.*

A worker's compensation claimant bears the "burden of proving, by a preponderance of the evidence, all the facts essential to recovery." *Evans v. Hara's, Inc.*, 123 Idaho 473, 479, 849 P.2d 934, 940 (1993). When seeking recovery for an occupational disease, the claimant must establish that the disease was "actually incurred in the employer's employment." I.C. § 72-439(1). The term "incurred" means "arising out of and in the course of" employment." I.C. § 72-102(21)(b) (2021); *see also Jobe v. Dirne Clinic/Heritage Health*, 163 Idaho 65, 67, 408 P.3d 63, 65 (2017). In other words, "[t]he claimant has the burden of proving his work environment caused his occupational disease." *Est. of Aikele v. City of Blackfoot*, 160 Idaho 903, 913, 382 P.3d 352, 362 (2016), *superseded by statute on other grounds*, I.C. § 72-438(14), *as recognized in Nelson v. Pocatello*, 170 Idaho 160, 175, 508 P.3d 1234, 1249 (2022).

The causal connection between the employment and the disease must be proven "to a reasonable degree of medical probability." *Id.* at 911, 382 P.3d at 360 (quoting *Wichterman v. J.H. Kelly, Inc.*, 144 Idaho 138, 141, 158 P.3d 301, 304 (2007)). "[T]his Court has used the 'preponderance of the evidence' standard interchangeably with the 'reasonable degree of medical probability' standard due to the definition of 'probable' in the context of medical expert testimony in worker's compensation cases." *Tenny v. Loomis Armored US, LLC*, 168 Idaho 870, 878, 489

P.3d 457, 465 (2021). " '[P]robable' is defined as 'having more evidence for than against.' " *Est. of Aikele,* 160 Idaho at 911, 382 P.3d at 360 (quoting *Jensen v. City of Pocatello*, 135 Idaho 406, 412, 18 P.3d 211, 217 (2000)). "Proof of a *possible* causal link is not sufficient to satisfy this burden." *Id.* (emphasis added).

Mrs. Weeks contends that the Commission did not apply a preponderance of the evidence standard but erroneously applied a "beyond a reasonable doubt" or "beyond every possible doubt" standard to conclude she had failed to prove her husband actually incurred COVID-19 from his employment. In support of this contention, Mrs. Weeks points to the Commission's conclusion that there were "simply too many unknowns" in the case that made it "impossible" to determine where the decedent contracted COVID-19. She argues that these statements—along with the Commission's statement that direct proof of causation could only be established "if the Decedent saw literally no one except work colleagues who had symptomatic COVID-19 during the relevant timeframe"—demonstrate that the Commission required her to meet a higher burden of proof: "beyond all possible doubt." We disagree.

When read in the context of the Commission's analysis as a whole, the statement that it was "impossible" for Mrs. Weeks to prove that Mr. Weeks contracted COVID-19 at work was, in essence, a legal conclusion that Mrs. Weeks could not meet her burden in this case with the evidence she presented. The Commission ruled:

> 41. *Based on the evidence presented*, Claimant has not proven *by a preponderance of the evidence* that the Decedent contracted COVID-19 from work. It is certainly *possible* that the Decedent contracted COVID-19 asymptomatically while in close proximity to his colleagues during work meetings or while in a work truck. It is unfortunately also possible he contracted it while speaking with a cashier at the lumber store or convenience store. It is also possible the Decedent spoke to another individual unknown to any of the parties, such as his uncle while tending to his cows or the cashier at the parts store. *There are simply too many unknowns for the Claimant to show that it is more likely than not that the Decedent caught COVID-19 from a work colleague vs. any other people he came in contact with*.
>
> . . . .
>
> 43. Dr. Nathan's and Dr. Coffman's testimony that the disease was extremely prevalent, easy to transmit through proximity, and that it transmitted asymptomatically coupled with potential non-work-related exposures makes it *impossible to prove on a more likely than not basis* that the Decedent contracted COVID-19 at work. The burden to prove causation is on Claimant; the nature of the disease and the fact that the Decedent cannot testify makes that burden extremely difficult to carry in this case, but no less Claimant's burden. Claimant

has failed to prove the Decedent "actually incurred" COVID-19 arising out of and in the course of employment.

(Emphasis added.) The Commission's analysis demonstrates that it identified other, non-employment-based possible exposures to COVID-19 from the evidence presented and found these other possible exposures to be at least as likely as employment-based exposure. It is the claimant's burden to prove employment-based causation on a "more likely than not" basis. *Tenny*, 168 Idaho at 878, 489 P.3d at 465; *Koester v. State Ins. Fund*, 124 Idaho 205, 208, 858 P.2d 744, 747 (1993) ("While the Workers' Compensation Act is to be construed liberally in favor of the injured employee, a claimant has the burden of proving a probable, not merely a possible, causal connection between the employment and the injury or disease." (internal citation omitted)). Here, the Commission concluded Mrs. Weeks had not demonstrated it was more probable than not that Mr. Weeks actually incurred the disease from his employment. In other words, the Commission applied the preponderance of the evidence standard and concluded Mrs. Weeks had not met it. Accordingly, the Commission did not impose an incorrect legal burden on Mrs. Weeks.

2. *The Commission did not err by failing to resolve doubts in favor of compensability.*

Mrs. Weeks next contends the Commission erred by failing to resolve any doubts regarding where Mr. Weeks contracted COVID-19 in favor of finding he contracted it from his employment. In support of this contention, Mrs. Weeks cites to caselaw involving accidental injury cases, where this Court has stated, "[i]f there is doubt surrounding whether the accident in question arose out of and in the course of employment, the matter will be resolved in favor of the employee." (Quoting *Page v. McCain Foods, Inc.*, 141 Idaho 342, 347, 109 P.3d 1084, 1089 (2005); then citing *Dinius v. Loving Care & More, Inc.*, 133 Idaho 572, 574, 990 P.2d 738, 740 (1999); and then citing *Hansen v. Superior Prods. Co.*, 65 Idaho 457, 463, 146 P.2d 335, 338 (1944) ("[W]e resolve the doubt in favor of the workman.")). She contends that this Court has established a "balance-tipping standard" because the phrase "arising out of and in the course of employment" (in Idaho Code section 72-102(17)(a)) and the term "employee" (in Idaho Code section 72-102(11)) are liberally construed in favor of the employee " 'in order to serve the humane purpose' for which worker's compensation law was promulgated." (First quoting *Sharp v. Thomas Bros. Plumbing*, 170 Idaho 343, 357, 510 P.3d 1136, 1150 (2022); and then citing *Olson v. Union Pac. R.R. Co.*, 62 Idaho 423, 427, 112 P.2d 1005, 1006 (1941)). We are unpersuaded.

Regardless of whether a claimant is seeking compensation for a workplace injury or an occupational disease, the claimant bears the "burden of proving, by a preponderance of the

evidence, all the facts essential to recovery." *Evans v. Hara's, Inc.*, 123 Idaho 473, 479, 849 P.2d 934, 940 (1993). When a claimant seeks worker's compensation benefits for a workplace injury, "the claimant carries the burden of establishing that he suffered both (1) an industrial *accident* and (2) a compensable *injury* resulting from that accident." *Jordan v. Walmart Assocs. Inc.*, 173 Idaho 115, 121, 539 P.3d 593, 599 (2023). However, if "there is some doubt whether the *accident* in question arose out of and in the course of employment," the doubt is resolved in favor of compensation. *Dinius*, 133 Idaho at 574, 990 P.2d at 740 (emphasis added).

An employee is entitled to worker's compensation benefits when he has suffered an injury "caused by an accident 'arising out of and in the course of any employment.' " *Page*, 141 Idaho at 347, 109 P.3d at 1089 (first quoting *Dinius*, 133 Idaho at 574, 990 P.2d at 740; and then citing *Seamans v. Maaco Auto Painting & Bodyworks*, 128 Idaho 747, 918 P.2d 1192 (1996)). "The words 'out of' have been held to refer to the origin and cause of the accident and the words 'in the course of' refer to the time, place, and the circumstances under which the accident occurred." *Id.* (quoting *Dinius*, 133 Idaho at 574, 990 P.2d at 740). In other words, when there is reason to believe the employee was working or was engaged in employment-related activities at the time the accident occurred, any doubt on that issue is resolved in favor of the employee. The claimant will still have the burden of proving, by a preponderance of the evidence, that the *injury* for which he seeks compensation was caused by the workplace accident and not some other condition or cause.

Mrs. Weeks acknowledges that this Court has applied what she characterizes as a "balance-tipping standard" only to accident and injury cases. There is good reason for this precedent. Accidents are distinct from occupational diseases. An accident is a discrete event or occurrence that happens at a particular time and in a particular place. *See* I.C. § 72-102(17)(b). In contrast, an occupational disease may not arise from a discrete event or occurrence; a disease can develop over time, from a series of different exposures, accidents, or events in different places. *Sundquist v. Precision Steel & Gypsum, Inc.*, 141 Idaho 450, 455–56, 111 P.3d 135, 140–41 (2005). Section 72-102(21)(a) of the 2021 Idaho Code defines an occupational disease as "a disease due to the nature of an employment in which the hazards of such disease actually exist, are characteristic of, and peculiar to the trade, occupation, process, or employment . . . ." Thus, to recover for a compensable occupational disease, a claimant must prove he has a disease that (1) arose from "the nature of" his employment, (2) is "peculiar" to it, and (3) is not from "hazards that are common to the public in general." I.C. §§ 72-102(21)(a) (2021), 72-438. Proving each of these elements is not

13

akin to proving there was an *accident* that arose out of and in the course of employment. Rather, it is more analogous to proving the *condition* (the alleged injury) for which one seeks compensation is the *result* of a workplace accident.

The Court's precedent in tick bite cases demonstrates that there is no "balance tipping standard" in favor of an employee in occupational disease cases. *See Roe v. Boise Grocery Co.*, 53 Idaho 82, 21 P.2d 910 (1933) (holding an employee's death from Rocky Mountain Spotted Fever was compensable because claimant had proven the deceased was bitten from a tick that came from his employment as a traveling salesman through rural Idaho and Oregon, despite the possibility that the decedent was later bitten by a second tick while at his daughter's home); *but see Koester*, 124 Idaho 205, 858 P.2d 744 (affirming the denial of compensation for Lyme disease because claimant had failed to prove the tick that bit her came from her place of employment as a home health provider).

Mrs. Weeks contends that *Roe* supports her proposition of a "balance tipping standard" in occupational disease cases, arguing *Roe* resolved doubts regarding where the employee contracted the disease in favor of the claimant. We do not read *Roe* for this proposition.

In *Roe*, there was substantial and competent evidence in the record that the employee had been bitten on the leg by a tick while working. However, there was some doubt as to whether a second bite the employee later suffered on the shoulder during a visit to his daughter's home was from a tick or some other insect. *Id*. at 88, 21 P.2d at 912–13. Because the nature and origin of the first bite on the leg was clearly established by the facts of the case, and because the medical evidence established that the first bite was sufficient to result in the employee's death from Rocky Mountain Spotted Fever, the nature and origin of the second bite on the shoulder had no bearing on the outcome of the case. In other words, even if the second bite on the shoulder had been from a tick and not some other non-disease carrying insect—an assumption this Court accepted as true for purposes of its analysis—this would not alter the conclusion that the first bite on the leg caused the employee's disease. *Id*. at 88–90, 21 P.2d 913–14. Thus, *Roe* does not support Mrs. Week's proposition of a "balance tipping standard" in occupational disease cases.

This Court's decision in another tick bite case demonstrates that doubts regarding where an employee contracted a disease are *not* resolved in favor of the claimant. *Koester*, 124 Idaho at 209–10, 858 P.2d at 748–49. In *Koester*, the claimant noticed a tick bite while working as a home healthcare provider, specifically, while she was cleaning her patient's home. *Id.* at 208, 848 P.2d

at 747. Such a fact could lead to the logical conclusion that she was bitten at work and the tick that bit her came from that patient's home. Or, said differently, it could lead to the conclusion that the tick bite came from her employment. However, no ticks were ever seen in the patient's home, the patient was bedridden and never left her home, and the patient only had house pets that also did not leave the home. *Id*. at 207, 858 P.2d at 746. In addition, the claimant's own home was a likely source of ticks because she lived among fir trees and her husband worked as a logger. *Id*. Accordingly, the Commission concluded the claimant failed to prove she contracted Lyme disease from her employment and denied her compensation. *Id*.

This Court affirmed the Commission's decision on appeal, specifically stating that the claimant failed to eliminate the other possible sources of her Lyme disease:

> While Koester's testimony about where she noticed being bitten raised the possibility that she was bitten in the course of her employment, she failed to put on any other evidence . . . to strengthen her contention that in all probability the bite occurred at her workplace. The record before this Court shows no evidence concerning the incubation period of Lyme disease; how long after a bite symptoms become evident; how long she had been at work before she noticed the itching; whether itching is an immediate reaction to a tick bite; or whether ticks that carry Lyme disease are prominent in the Potlatch area. Additionally, Koester was not diagnosed with Lyme disease until approximately eighteen months after she noticed the bite on her leg.

> In conclusion, . . . Koester failed to eliminate any other possibilities. Therefore, we hold that there is substantial competent evidence to support the Commission's findings and conclusions that Koester failed to meet her burden of proving she received a bite which allegedly caused Lyme disease in the course of her employment.

*Id*. at 209–10, 858 P.2d at 748–49. Thus, there was no "balance tipping standard" applied in *Koester*.

This case is no different than the situation in *Koester*. Here, the Commission did not express doubt as to the burden of proof to be applied. Consistent with *Koester,* the Commission considered the evidence presented by Mrs. Weeks and concluded it was "impossible" to rule out "other potential exposures" to the COVID-19 virus and "impossible to prove on a more likely than not basis that the Decedent contracted COVID-19 at work." *See* 124 Idaho at 209–10, 858 P.2d at 748–49 (upholding the Commission's conclusion that it was " 'impossible to ascertain' where and when [the claimant] was bitten"). These conclusions do not reflect a misapprehension of the burden of proof but rather reflect the fact that the record established that there were other potential sources of the virus, which, as discussed below, contradicted the fundamental premise upon which Mrs.

15

Weeks' own expert's opinion was built—namely, that Mr. Weeks' only possible exposure to COVID-19 was at his workplace. The bottom line is that the Commission concluded a contagion from an employment-based source was *not* more probable than a contagion from the other possible sources.

While the Commission's conclusion required it to assign weight to the various possible source of contagions, assigning weight to the evidence in the record is a function of the Commission's fact-finding duties and is not the basis for claiming error. *Lowery v. Galen Kuykendall Logging*, 174 Idaho 922, 930, 560 P.3d 1069, 1077 (2024) ("[T]he Commission is the fact finder [and] its conclusions on the credibility and weight of the evidence will not be disturbed on appeal unless they are clearly erroneous."). "This Court does not weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented." *Id.* (quoting *Hiatt v. Health Care Idaho Credit Union*, 166 Idaho 286, 290, 458 P.3d 155, 159 (2020)). Accordingly, the Commission did not err by failing to apply a "balance tipping standard" regarding where Mr. Weeks may have contracted COVID-19.

3. *The Commission did not err by failing to consider whether Mr. Weeks contracted COVID-19 from gas station visits and whether those visits were within the course of his employment.*

Mrs. Weeks next contends the Commission erred by failing to recognize that Mr. Weeks' gas station visits—which the Commission identified as a possible source of COVID-19 transmission—were within the course or scope of his employment. Mrs. Weeks argues that the facts in the record demonstrate that the gas station visits were in the course Mr. Weeks' employment, citing the "going and coming" rule from *Hansen v. Estate of Harvey*, 119 Idaho 333, 338, 806 P.2d 426, 431 (1991), and the "personal comfort doctrine" from *Thompson v. Clear Springs Foods, Inc.*, 148 Idaho 697, 698–99, 228 P.3d 378, 379–80 (2010) (citation omitted). She argues that had the Commission recognized these legal principles, it would have changed the Commission's analysis as to the most likely source of Mr. Weeks' illness and thus impacted the ultimate conclusion as to whether the decedent actually incurred COVID-19 from his employment. We disagree. The record establishes that Mr. Weeks' gas station visits took place at a variety of times, including on his days off work, or on his way to or from his ranch, in his own personal vehicle. The Commission's decision was broad enough to include these non-employment-related visits as a possible source of COVID-19 transmission. Accordingly, the Commission did not err

16

by failing to consider whether Mr. Weeks contracted COVID-19 from a gas station visit that may have been within the course of his employment.

4.         *The Commission's conclusion that Mrs. Weeks had failed to prove her husband "actually incurred" COVID-19 from his employment is supported by substantial and competent evidence.*

Mrs. Weeks' remaining arguments suggest the Commission lacked support for its conclusion that she failed to prove her husband "actually incurred" COVID-19 from his employment. She argues that the Commission's conclusion is not supported by its own findings regarding the "probable window of transmission." She maintains the Commission adopted Dr. Coffman's "bell-shaped window of probability"—which she contends was the seven days prior to Mr. Weeks' manifestation of symptoms on September 29—but erroneously considered all "possible" and "unknown" contacts Mr. Weeks may have had with others between September 17 and 27. Mrs. Weeks argues that, had the Commission confined its analysis to the dates within the window of transmission it adopted, a workplace transmission of September 27 emerges as the most probable due to the known contacts Mr. Weeks had with others during the equipment training that day. We conclude the Commission's findings and conclusion are supported by substantial and competent evidence.

When reviewing the Commission's decision in a worker's compensation case, this Court gives great deference to the Commission's factual findings:

> The Industrial Commission, as the factfinder, is free to determine the weight to be given to the testimony of a medical expert. The opinions of an expert are not binding upon the trier of fact, but are advisory only. It is the role of the Industrial Commission, not this Court, to determine the weight and credibility of testimony and to resolve conflicting interpretations of testimony. On appeal, this Court will not conduct a de novo review of the evidence or consider whether it would have reached a different conclusion from the evidence presented.

*Waters v. All Phase Constr.*, 156 Idaho 259, 262, 322 P.3d 992, 995 (2014) (internal quotation marks and citations omitted). In reaching its findings, "the Commission may consider the totality of the testimony and evidence" and may synthesize aspects of more than one expert's testimony or opinion to reach a conclusion on causation. *Lowery*, 174 Idaho at 933–34, 560 P.3d at 1080–81 (citing *Tenny v. Loomis Armored US, LCC*, 168 Idaho 870, 879, 489 P.3d 457, 466 (2021) (approving the Commission's decision to "piece[] together" the evidence from differing medical opinions)).

17

Here, the Commission found both experts to be persuasive on certain points and adopted aspects of both experts' opinions:

> 35. Although both experts were persuasive on certain points, Dr. Coffman's detailed explanation of RNA replication makes Dr. Coffman's opinion slightly more persuasive regarding exposure/incubation/transmission. Dr. Nathan's opinion seems to be that once exposed, a host is immediately contagious despite also acknowledging that it does take time for the virus to replicate. In line with that, Dr. Nathan did think it was much more likely that the Decedent was exposed on the 16th than the 28th. Dr. Nathan's opinion that the Decedent could have been exposed on the 28th and then shown symptoms on the 29th is rejected. Dr. Nathan's opinion that Decedent could have been exposed on the 16th and then shown symptoms on the 29th is "not impossible" per Dr. Coffman, but a less than 1% chance.

Thus, the Commission rejected only September 28, 2021, as a possible date that Mr. Weeks contracted COVID-19. The Commission did not otherwise assign probable weights to a transmission between September 18 and September 27. Accordingly, Mrs. Weeks is incorrect in her assertion that the Commission adopted Dr. Coffman's seven-day window of transmission, which she defines as "the seven days before [Mr.] Weeks in fact manifested COVID-19 symptoms." (Emphasis omitted.)

The record also does not support Mrs. Week's contention that September 27 was within Dr. Coffman's probable window of transmission. Dr. Coffman described the development of COVID-19 symptomology as a seven-day bell-curve, with symptoms beginning three days after exposure:

> The typical timeline would be exposure on day 0, viral detection starting day 2, and *symptoms,* if they develop, *on day 3, no sooner.* Some patients have somewhat slower onset, however the onset of viral detection and symptom onset will be complete in close to 100% of patients by 7 days post-exposure.

(Emphasis added.) Dr. Coffman further emphasized that the most probable dates of transmission were between September 23 and 26, with "maybe" an 80% likelihood. Of those dates, only September 23 was a workday, and the record reflects Mr. Weeks was working on his ranch the other days. Accordingly, Dr. Coffman's testimony does not support Mrs. Weeks' contention that a workplace transmission on September 27 was the most probable.

Notwithstanding this correction of Dr. Coffman's testimony, the Commission's decision reflects that it did not fully adopt Dr. Coffman's proposed dates of transmission but considered a longer transmission period of September 16 to September 27, consistent with Dr. Nathan's explanation of a more flexible progression of the COVID-19 virus. However, the Commission's

18

decision also reflects that it found Dr. Nathan's opinion that Mr. Weeks contracted the virus from work to be based upon a faulty premise—that Mr. Weeks did not have contact with others, apart from his wife, outside of work:

> The facts against that finding are that the Decedent went to the lumber store on the 18th, that the Decedent may have worked with others while tending to his cows any of the days from the 16th to the 27th and may have gone to the parts store. There was also testimony of habit that the Decedent occasionally went to the convenience store/gas station to buy nicotine pouches, soda, or burritos on days he was working.

Importantly, Dr. Nathan's testimony was *not* that a workplace transmission was most probable *even if* Mr. Weeks had contact with his uncle or neighbor while tending cows, or any other person he may have had contact with in any of the stores he frequented. Rather, Dr. Nathan expressly stated that his opinion was based on the assumption that Mr. Weeks did not "interact with anybody other than his wife at home and his coworkers at work" and did not frequent any stores. This assumption was disproven by the testimony received by the Commission and other evidence in the record. The Commission weighed the evidence to conclude Mrs. Weeks could not prove it was more likely than not that Mr. Weeks contracted COVID-19 from his employment:

> 41. Based on the evidence presented, Claimant has not proven by a preponderance of the evidence that the Decedent contracted COVID-19 from work. It is certainly possible that the Decedent contracted COVID-19 asymptomatically while in close proximity to his colleagues during work meetings or while in a work truck. It is unfortunately also possible he contracted it while speaking with a cashier at the lumber store or convenience store. It is also possible the Decedent spoke to another individual unknown to any of the parties, such as his uncle while tending to his cows or the cashier at the parts store. There are simply too many unknowns for Claimant to show that it is more likely than not that the Decedent caught COVID-19 from a work colleague vs. any other people he came in contact with.

Notably, Mrs. Weeks does not argue that the Commission's findings, regarding where Mr. Weeks went or who he was with, are not supported by substantial and competent evidence in the record. Indeed, as the Commission noted, these facts are undisputed. The record reflects that the decedent did sometimes work with his uncle or a neighbor on the ranch with the cows but is silent on whether he did in fact work with either of them during the relevant time period at issue here; neither the uncle nor the neighbor testified and Mrs. Weeks was not with the decedent when he was on the ranch. Thus, the record also supports the Commission's conclusion regarding this "unknown."

Mrs. Weeks argues that it is "impossible" for her to prove a "negative," suggesting it was unfair for the Commission to require her to resolve these "unknowns." She argues she should not

19

have had to prove Mr. Weeks did *not* see his uncle or the neighbor, or did *not* visit the parts shop or a convenience store during the relevant time period because it is sufficient for her to establish a reasonable likelihood of a workplace transmission. This argument is unavailing. Under worker's compensation law, it was Mrs. Weeks' burden to prove Mr. Weeks contracted COVID-19 from his employment to a reasonable degree of medical certainty. *Tenny*, 168 Idaho at 878, 489 P.3d at 465. In other words, Mrs. Weeks was required to provide medical testimony demonstrating that, *even if* Mr. Weeks had contacts with others outside of work, more likely than not he still contracted COVID-19 from work and *not* those other contacts. No such medical testimony was provided here.

In sum, the Commission did not err in concluding Mrs. Weeks failed to prove Mr. Weeks incurred COVID-19 in his employment. The Commission applied the preponderance of the evidence standard to its analysis, and its conclusions were supported by its factual findings, the medical testimony, and the other evidence in the record. Accordingly, we affirm the Commission's decision denying Mrs. Weeks' worker's compensation claim for medical and death benefits pertaining to Mr. Weeks' COVID-19 illness. Because we affirm the Commission's decision on this basis, we decline to address the employer's conditional issue on appeal of whether COVID-19 is a compensable occupational disease under Idaho Code sections 72-102(21)(a) and 72-438 (2021).

### IV. CONCLUSION

For the foregoing reasons, we affirm the Commission's denial of worker's compensation benefits on the basis that Mrs. Weeks failed to establish the decedent actually incurred COVID-19 from his employment by a preponderance of the evidence. As the prevailing party, Oneida County and the State Insurance Fund are entitled to costs on appeal as a matter of course under Idaho Appellate Rule 40(a).

Chief Justice BEVAN, and Justices MOELLER, ZAHN and MEYER CONCUR.